THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* KENNETH SNYDER and HENRY KENNEDY, Appellants.

Argued May 27, 1947; decided July 2, 1947.

*W. Bartlett Sumner* and *John O. Henderson* for Henry Kennedy, appellant. I. The fundamental right of a defendant to defend by counsel of his own choosing is denied unless he obtains a reasonable time and a fair opportunity to secure counsel of his own choice and, with that counsel's assistance, to prepare for trial. (*People* v. *McLaughlin*, 291 N. Y. 480; U. S. Const. 6th Amendt.; N. Y. Const. art. I, § 6; Code Crim. Pro., §§ 8, 188, 308, 357; *People* v. *Spohr*, 206 N. Y. 516.) II. Where a homicide case is submitted to the jury on two or more distinct theories, one of which is basically wrong, the court cannot speculate as to which theory was adopted and a conviction of murder in the first degree will be reversed. (*People* v. *Lazar*, 271 N. Y. 27.) III. Where a person is convicted of a felony murder, it must be properly charged that the killing must take place

during the period between the inception of the attempt **to** commit the felony and the consummation, frustration or abandonment of the attempt and that the accused specifically intended to commit such felony. (*People* v. *Wagner,* 245 N. Y. 143; *People* v. *Ryan,* 263 N. Y. 298; *People* v. *Luscomb,* 292 N. Y. 390; *People* v. *Levan,* 295 N. Y. 26; *People* v. *Roper,* 259 N. Y. 170.) IV. Where a confession of a defendant is obtained while he is handcuffed to a police officer and returned to the scene of the crime and asked questions concerning the crime, it is not an involuntary confession and should not be admitted in evidence against him. (Code Crim. Pro., § 395; *People* v. *Smith,* 232 N. Y. 239.)

*Jerome Cantor* and *W. Franklin Ness* for Kenneth Snyder, appellant. I. Defendant Snyder was entitled to a separate trial and refusal to grant this, was an abuse of trial court's discretion; in retrospect, the failure to give him a separate trial was an injustice and an impairment of his substantial rights. (*People* v. *Feolo,* 282 N. Y. 276; *People* v. *Robinson,* 273 N. Y. 438.) II. Allowing proof of the commission of another crime and permitting the introduction of other evidence, implying or intimating that another crime was committed by the defendant, was reversible error. (*People* v. *Feldman,* 296 N. Y. 127; *People* v. *Molineaux,* 168 N. Y. 264; *People* v. *Robinson,* 273 N. Y. 438; *People* v. *Harvey,* 235 N. Y. 282; *People* v. *Loomis,* 178 N. Y. 400; *People* v. *Buffom,* 214 N. Y. 53; *Boyd* v. *United States,* 142 U. S. 450.) III. The trial court committed numerous errors of more than a technical nature which were prejudicial to defendant Snyder and which justify and require a reversal of his conviction. (*People* v. *Feldman,* 296 N. Y. 127; *People* v. *Elmore,* 277 N. Y. 397.) IV. It was error for the trial court to refuse to charge that there was a duty on the police to arraign the defendant Snyder without necessary delay, which is the substance of section 165 of the Code of Criminal Procedure, to wit, " The defendant must in all cases be taken before the magistrate without unnecessary delay ". (Penal Law § 1844; *People* v. *Elmore,* 277 N. Y. 397; *People* v. *Alex,* 260 N. Y. 425; *People* v. *Leonardi,* 143 N. Y. 360.) V. Under section 425 of the Code of Criminal Procedure, the court "may permit" the jury, upon retiring, to take all exhibits, "but only upon the consent of the defendant and counsel for the People". VI. Defendant

Snyder was not accorded a fair trial and his conviction should be reversed and a new trial granted. (*People* v. *Sobieskoda,* 235 N. Y. 411; *People* v. *Wolf,* 183 N. Y. 464.)

*Gordon Steele, District Attorney* (*Leonard Finkelstein* of counsel), for respondent. I. The trial court's denial of the motion for adjournment did not prejudice the rights of appellant Kennedy. II. The trial court submitted the case to the jury with proper instructions on two theories, murder by premeditation and deliberation, and felony murder. The jury returned a verdict of guilty of murder in the first degree, on felony murder, without recommendation of life imprisonment. The theory adopted, and the intention of the jury, was thus clear and distinct. III. The trial court properly charged that in felony murder, the homicide must occur during the commission of, or in an attempt to commit, a felony and also, on intent of accused to commit the felony. (*People* v. *Rutigliano,* 261 N. Y. 103.) IV. The trial court fully and adequately charged on the various degrees of homicide in connection with the ability of the defendant to form intent to commit the felony. (*People* v. *Cummings,* 274 N. Y. 336; *People* v. *Koerber,* 244 N. Y. 147; *People* v. *Stevens,* 272 N. Y. 373; *People* v. *Moran,* 246 N. Y. 100.) V. The confessions by appellants, in re-enacting the crime at the scene, were properly received and submitted for consideration by the jury. (*People* v. *Meyer,* 162 N. Y. 357; *People* v. *Chapman,* 224 N. Y. 463; *People* v. *DiGregario,* 205 App. Div. 629; *People* v. *Doran,* 246 N. Y. 409; *People* v. *Garfalo,* 207 N. Y. 141; *People* v. *Randazzio,* 194 N. Y. 147.) VI. The court's discretion was properly exercised in the denial of a separate trial. (*People* v. *Snyder,* 246 N. Y. 491; *People* v. *Fisher,* 249 N. Y. 419; *People* v. *Doran,* 246 N. Y. 409; *People* v. *Marcus,* 220 App. Div. 697, 246 N. Y. 637.) VII. Denial was made of any unnecessary delay. The evidence, not only by the People's witnesses but by the appellants, clearly establishes that the arraignment was not unnecessarily delayed to provide time and opportunity for the extortion of the confessions, by means of force, fear, threats or promises. VIII. The trial court's action with respect to the exhibits was proper. An objection plainly stated on the record is more satisfactory than the unrecorded words of a private conversation, and, is in greater protection of the appellant's rights, in the event of error or inadvertence in the taking of the

exhibits. This is consistent with the intent of section 495 of the Code of Criminal Procedure. (*People* v. *Hughson, 154* N. Y. 153; *People* v. *Gallagher*, 75 App. Div. 39, 174 N. Y. 505; *People* v. *Dolan*, 186 N. Y. 4; *Levy* v. *Corn*, 191 App. Div. 56.)

CONWAY, J. On an evening in September, 1946, the defendants met in a tavern in Buffalo. Both had been drinking and they continued to do so together. They had known each other for a few months. About midnight Snyder asked Kennedy if he would go with him to a house at Mortimer Street and Broadway, where he had formerly occupied a room, to get a watch which he had left there as well as any other money or valuables which could there be stolen. Kennedy said he would and they set off together. The watch was a "woman's gold wrist watch" which Snyder had purchased for $5, believing it to have been stolen, and which he had hidden in an electrical outlet. The room was numbered 1 and was on the second floor, of a two-story building, over a store. There were a dozen or more very small rooms on the floor with a common bathroom. They were numbered and let to roomers. They rented for approximately $2.50 each per week or for about 35 cents a day. Snyder had not lived in the house since 1944 but this was not the first time he had returned to seek the watch. In July of 1946, two months before, he had returned when intoxicated — he had been convicted of drunkenness in 1944 and again in 1945 — and had told the then occupant of room 1, the witness Bress, about the watch and had asked to be permitted to get it. Bress had refused and had put him out of the house. When Snyder and Kennedy arrived on this September night, they climbed upon the roof of the adjoining building and then entered the rooming house through a window. Kennedy said Snyder unlocked a door with some keys and they entered room 1. Snyder took the face off an outlet near the floor but failed to find his watch. They searched some clothes there, pulled the mattress off the bed and cut or ripped it open. They stayed in the room for ten or fifteen minutes but found nothing. Snyder then left that room, went along the corridor toward the rear and approached room 10. That had been the room of a man whom Snyder had noticed on more than one occasion loitering, as he thought, near room 1, when Snyder lived there and he

intended to ask him, if he were still there, whether he knew anything about the watch. He saw a light under the door and knocked. Unfortunately room 10 was then occupied by William Callahan, the deceased, an elderly man who was employed as a janitor of a church. Callahan was not the man Snyder expected to see and neither defendant had ever seen him before. He opened his door and appeared to be surprised to see the defendants. They thought he was going to call out so they struck him, knocked him down and jumped upon him with their feet or kicked him. One or both ruptured his liver, lacerated his spleen, fractured his sternum and ribs and cut him upon the hand and face. From the injuries to the liver and spleen he died. They searched Callahan and the room but found nothing of value. They then left the premises, visited another tavern and separated. Snyder said he remembered nothing more until he awakened in his sister's home at noon the next day. Kennedy's wife testified that someone brought him home and he staggered to bed where he slept in his clothes and she left him there the following morning when she went to work. Neither Snyder nor Kennedy saw the other again until after their arrest on the 8th and 9th days of October respectively. Then each attempted to absolve himself of the killing and to put the full blame for the crime upon the other.

Such is the substance of the occurrences detailed to the jury. The defendants could have been bent upon robbery and brutally slaying Callahan to effectuate their purpose or the slaying might have been the result of drunken frenzy, without intent either to commit robbery or cause death. This was surely a case where it was necessary for prosecution and court to exercise " a caution increasing in degree as the offenses dealt with " increased in gravity (*Patton* v. *United States*, 281 U. S. 276, 313) in order that the defendants might be accorded their legal rights despite the natural indignation inspired by their conduct. One of those rights was to have counsel who was adequately prepared to defend them (*Glasser* v. *United States*, 315 U. S. 60, 71).

The defendants were tried for murder committed while engaged in an attempted robbery and for common-law murder. While some reference was made to burglary the court in

response to the final request to charge stated to the jury that "if it were a burglary to get into that house originally, it had been completed, in the Court's opinion, and when they went into room 10 *they were embarking on a different enterprise.* There is no connection whatsoever with the burglary." (Emphasis supplied.) That became the law which the jury was obligated to accept and apply and which is binding upon the People on this appeal. Both defendants were convicted of murder in the first degree while engaged in the commission of a felony, without a recommendation of life imprisonment.

The crime was committed on September 28, 1946. By October 25th it was evident that Snyder and Kennedy were wholly destitute and unable to employ counsel of their own choosing or to defray any incidental expense which might be incurred in the conduct of their cases. The County Court Judge so found and thereupon, on that day, assigned counsel for Snyder and separate counsel, Mr. Dwyer and Mr. Henderson, for Kennedy. In the following month, Mr. Steele, who later tried the instant case, was elected District Attorney of Erie County. Between the date of his election and December 31st he invited Mr. Dwyer, counsel for Kennedy, to become First Assistant District Attorney under him. On December 31st the same County Judge who had made the original assignment, entered an order, dated on that day, which contained the following recitals, among others, "It further appearing that the said John F. Dwyer has been appointed and has accepted the position of Assistant District Attorney of Erie County, and

It further appearing that by accepting said appointment, the said John F. Dwyer, Esq., has disqualified himself to act as counsel for the said defendant, Henry Kennedy, and the said resignation of the said John F. Dwyer having been received and accepted, and * * *".

The order then directed that Mr. Dwyer be relieved of his counselship to Kennedy and that W. Bartlett Sumner be appointed in his place.

The clerk's minutes show that on January 3d, three days later, Mr. Steele moved before the Trial Justice to transfer the case to the Supreme Court and that the motion was granted. Mr. Sumner was present, as appeared later, because the County Judge had told him on December 31st that the retiring District

Attorney had noticed the trial for January 6, 1947. Mr. Sumner requested an adjournment for two weeks since he had been in the case for but three days. The minutes recite: "Motion denied for *any* postponement." (Emphasis supplied.)

On January 6th, Mr. Sumner again appeared with Mr. Henderson before the Trial Justice and the following proceedings, quoted in full, were had:

"Mr. Sumner: May it please the Court, last Friday morning the District Attorney moved this case for trial against the defendant Henry Kennedy and the defendant Kenneth Snyder, both being charged with the crime of murder in the first degree.

"At that time there was no stenographer present when I made application for adjournment. Your Honor very graciously heard my argument and after we completed our argument and you ruled I called your attention to the fact there was no stenographer, I assume you will recall, and you said we could make the motion, so it would be part of the record, this morning, and, therefore, I will state now, as I did then, as to myself I was not notified until about noon Tuesday, the 31st day of December, by County Judge Robinson that he had appointed me to take the place of John Dwyer, who previously had been appointed to represent this defendant.

"At that time I told Judge Robinson I would accept the appointment but I did not know when I could get ready. He informed me he understood it was set for trial January 6th and, of course, any application I would make for adjournment would have to be made to your Honor.

"The following day was New Year's, Wednesday, and Thursday was the first time I was able to get in touch with the counsel, Mr. John Henderson, who had been appointed originally with Mr. Dwyer. In consultation with Mr. Henderson I learned he practically knew nothing about the case, had done little or no investigating, having relied upon Mr. Dwyer as counsel. I learned the only thing that had been done was that they made an application to your Honor for appointing a couple of psychiatrists, who were then making an examination of the defendants, and that the final step in their examination was to be taken this morning, the 6th of January, at the General Hospital, at 10 A.M., and would not receive the report until after that date.

" Mr. Dwyer in the meantime accepted an appointment as First Assistant District Attorney and I was unable to contact him until, I think, Saturday morning. I am not too sure about that; I may have gotten in touch with him Friday.

" The Court: You argued for adjournment as of last Friday. Let us not get beyond Friday.

" Mr. Sumner: Yes, let us not get beyond Friday. At that time I stated, and Mr. Henderson amplified my request,— we stated we felt the time was too short to properly prepare this case for trial and that we were not ready and I requested adjournment for two weeks, and your Honor at that time intimated, in fact, we were to be ready for trial, that you would not grant an adjournment and we should be ready for trial on Tuesday, the 7th of January. I wish now to take exception to your Honor's ruling.

" The Court: All right, you have the exception. Case set for tomorrow morning at 10 o'clock.

" Mr. Henderson: Your Honor ruled from the bench we were to have the names of the witnesses before the Grand Jury, which we assumed would be forthwith. We haven't them yet.

" Mr. Ball: I have them right now.

" The Court: All right. Case set for tomorrow morning at 10 A.M."

Neither the District Attorney nor the court questioned the truthfulness of the representations made by Mr. Sumner and Mr. Henderson in open court. Both counsel were men whose standing at the Bar and character had been certified to the Trial Justice by their assignment in a capital case by the County Judge.

It should further be noted that no reason for haste was either suggested or advanced by the District Attorney or the Trial Justice.

Counsel was thus ordered to trial in a capital case within six days after his assignment and within four days after he had contacted the retiring counsel. Of those six days, two and one-half were holidays. There was a further handicap under which the new counsel labored. The defendant Kennedy could neither read nor write and had never attended school. Although his calendar age was twenty-eight years, his mental age was

much less. There was testimony by Dr. Ulrich, one of the two psychiatrists appointed by the court, that Kennedy's "mental condition shows that he had an I. Q. of 72 and had the mentality of a boy or child about ten and a half or eleven years of age * * * so he is a more or less feeble-minded type of person, border-line. If he was 70 [I. Q.] or less he might go to a·school for feeble-minded in this State. The electro-encephalogram definitely shows an epileptic condition. And the history and our examination of him also showed epileptic condition." The epileptic condition was of importance because that condition is aggravated by alcohol which has a more pronounced and confusing effect upon an epileptic, even without a seizure, than upon a normal person. We may safely assume that it would take longer to consult with an epileptic with the mind of a boy of eleven years than with a normal client. The new counsel thus entered upon a trial which continued from January 7th to January 14th, *a longer time than was granted him for its preparation.*

We think that the right of Kennedy to a fair trial was not properly protected. His right to protection by court and prosecuting authorities so that he might have the assistance of adequately prepared counsel for his defense was a fundamental one. We think that the denial of a request for an adjournment under the circumstances here presented was an abuse of discretion as a matter of law. (*People* v. *McLaughlin,* 291 N. Y. 480; *Glasser* v. *United States,* 315 U. S. 60, 71, *supra;* N. Y. Const., art. I, § 6; *Powell* v. *Alabama,* 287 U. S. 45.)

Moreover, within three days after the assignment of the new counsel for Kennedy, following the setting of the day for trial by the outgoing District Attorney, the counsel assigned to defend Snyder moved, on January 3d, for a separate trial for him. That motion was denied. We think it was error to compel Snyder to go to trial jointly with a codefendant whose counsel was unprepared and that in the interest of justice it is necessary also to order a new trial for him.

There are other errors which should be mentioned since there must be another trial of the defendants.

The learned court charged the jury that the People claimed that the defendants were engaged in the commission of the

felony known as robbery and that it was for them to determine whether the defendants combined to commit a robbery and " if so, did either, in the course of the commission of that robbery, kill Callahan." The court then reviewed the contention of the People and of each of the defendants. The learned court then said: " Now, I have discussed the question of felony murder, which is murder in the first degree. If you should come to the conclusion, after discussing this evidence, that these two men were engaged in an attempted robbery at this time in room No. 10 and that during such attempt Callahan received the blows which resulted in his death, then each of these defendants would be guilty of murder in the first degree, a felony murder." The court then explained that in such case the jury could recommend life imprisonment.

Then the learned court made the following charge: " Now, if, after carefully considering the evidence in this case you come to the conclusion that the killing of the deceased *did not occur* while the defendants were engaged in the commission of a felony, *then you may consider the other forms of homicide. You would then come to common law murder in the first degree,* which involves a deliberate and premeditated intent to kill. *You do not come to consider common law murder if you find that the defendants were engaged in a felony at the time of the killing. Only in case you conclude there was not an attempted felony at the time.*" (Emphasis supplied.) Thereafter the other degree of murder and both degrees of manslaughter were charged.

We think that was incorrect. The order of consideration was not at the choosing of the court but of the jury. The jury could have first considered murder in the first degree committed during an attempted felony. It could with equal right have first considered one of the degrees of murder or manslaughter as charged to it. It was for the jury to decide. The charge as quoted improperly circumscribed its power and function.

The defendant Snyder was arrested about 8 P.M. on October 8th. Kennedy was arrested about 1 A.M. on the morning of October 9th. Neither was arraigned until 10 A.M. on the morning of October 10th. That was approximately thirty-eight hours after Snyder's arrest and thirty-three hours after that of Ken-

nedy. The statute (Code Crim. Pro., § 165) requires arraignment of a prisoner before a magistrate without unnecessary delay. The learned court left it to the jury as a question of fact to determine whether there had been such unnecessary delay saying: " The People claim that there was no unnecessary delay; that such a serious charge, with no eye witnesses, required investigation before charging the defendants with murder, and that the defendants' oral admissions of guilt warranted their being held until the statements could be reduced to writing and the defendants had reenacted their part in the alleged homicide." We think that that could be no excuse under the statute and that it was not permissible for a jury to find that it was. We have heretofore disapproved of the practice of unnecessarily delaying arraignments. (See *People* v. *Mummiani*, 258 N. Y. 394, 396; *People* v. *Elmore*, 277 N. Y. 397, 404.)

Finally at the conclusion of the charge, the learned court insisted in the presence of the jury that *counsel* state " in open court " whether or not they consented that the jury " have the exhibits, if they ask for them ". We find no such requirement in the statute. (Code Crim. Pro., § 425.) It reads as follows: " § 425. *What papers the jury may take with them.* The court may permit the jury, upon retiring for deliberation, to take with them any paper or article which has been received as evidence in the cause, but only upon the consent of the defendant and the counsel for the people."

A jury may always examine exhibits during its deliberations in the presence of court, counsel and defendant. Exhibits may not be taken to the jury room, however, where they are not under the watchful eye of the court, unless consent be given by the *defendant*. Even then it is within the discretion of the court to withhold exhibits from the jury room. When counsel decline, as here, to consent after being required to give or refuse consent in the presence of the jury, the reason for their conduct may very well be misinterpreted to the detriment of a defendant, especially when it is not explained that the exhibits may be examined by the jury in the courtroom at any time if desired. A statement later, in response to a request, that defendants are within their rights in refusing consent, does not cure the situation. The procedure followed appears to have

accomplished no useful evidentiary purpose. It is better to consider the question of consent under section 425 after the jury has retired.

The judgments of conviction should be reversed and new trials ordered as to both defendants.

DESMOND, J. (concurring). I agree with Judge CONWAY except as to the matter of the trial court's charge wherein the jury was told to take up the felony murder count first, as to the correctness of which instruction I express no opinion at this time.

The State of New York, careful of the lives of the least of her citizens, has a policy, in capital cases, of providing paid attorneys for indigent defendants and of providing in such cases, at public cost, other facilities for proper defense (Code Crim. Pro., § 308). That policy failed of effect in this case when the newly assigned lawyer for Kennedy, who was to be that defendant's trial counsel, was forced, over his protests, to go to trial six days after his assignment, with a holiday and a week end intervening. Since no court has any right to deprive a defendant of the protections guaranteed him by law (see *People* v. *McLaughlin,* 291 N. Y. 480) my vote is for reversal here, regardless of any lack of showing of prejudice, regardless of the strength of the proof of Kennedy's guilt, and despite the fact that Kennedy appears to have been expertly defended at the trial.

The judgments of conviction should be reversed and new trials ordered, as to both defendants.

LOUGHRAN, Ch. J., and DYE, J., concur with CONWAY, J.; DESMOND, J., concurs in separate opinion; LEWIS, THACHER and FULD, JJ., dissent and vote for affirmance.

Judgments of conviction reversed, etc.