THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.* RAYMOND R. WOODLEY, Appellant.

Third Department, March 24, 1948.

*Francis J. Riordan* and *Thomas L. Newton* for appellant.

*Gordon Steele, District Attorney* (*John F. Dwyer* and *Leonard Finkelstein, Assistant District Attorneys* of counsel), for respondent.

HEFFERNAN, J. In the afternoon of May 1, 1946, the dead body of John Yost was found in the barroom of a tavern conducted by him in the town of Colden, Erie County, New York. An examination of the body disclosed that death was due to a bullet discharged from a .38 calibre gun. The death bullet entered the body of the deceased in the back at the angle of the left scapula and the point of exit was in the right chest.

On June 21, 1946, the grand jury of Erie County returned an indictment against appellant charging him in two counts with the crime of murder in the first degree by reason of the death of Yost.

In the first count it is alleged, in the common-law form, in accordance with subdivision 1 of section 1044 of the Penal Law, that appellant willfully, feloniously and from a deliberate and premeditated design to effect his death, did kill and murder Yost.

In the second count he is charged with the murder of Yost while engaged in the commission of a felony, namely, attempted robbery in the first degree in violation of subdivision 2 of the same section.

The cause was submitted to a jury by the trial judge on both theories, each of which, in my opinion, was basically wrong and entirely without justification in law or fact.

The jury very properly rejected the theory that the death of deceased occurred as a result of common-law murder. It did find that appellant was guilty of felony murder and recommended life imprisonment as the punishment, which recommendation was adopted by the trial judge.

From the judgment of conviction an appeal was taken to the Appellate Division of the Fourth Department and that tribunal transferred the matter to our court for determination.

To warrant a conviction for murder in the first degree under subdivision 1 there must be proof beyond a reasonable doubt that the homicide was committed by the accused from a deliberate and premeditated design to effect the death of his victim; neither element alone is sufficient.

It is not only essential that there must be a deliberate and premeditated intention to kill but that intention must precede the killing by some appreciable space of time, long enough at least for some reflection and consideration, for choice to kill or not to kill (*People* v. *Majone*, 91 N. Y. 211).

. The proof in this record is wholly insufficient to justify the submission to the jury of the question of appellant's guilt of common-law murder. However, in view of the verdict the only question which we are called upon to consider is whether or not the killing took place while appellant was engaged in the commission of a felony. It is the claim of the People that the death of Yost occurred while appellant was attempting to commit the crime of robbery in the first degree.

Section 2 of the Penal Law provides: "An act, done with intent to commit a crime, and tending but failing to effect its commission, is ' an attempt to commit that crime.' "

" An attempt is an endeavor to do an act carried beyond mere preparation but falling short of execution. * * * There must be, to constitute an attempt, some overt act. Mere purpose or intent is not enough" (*People* v. *Collins*, 234 N. Y. 355, 359). Neither combination nor incitement nor preparation is enough (*People* v. *Mills*, 178 N. Y. 274, 284; *People* v. *Sullivan*, 173 N. Y. 122). " Felonious intent alone is not enough, but there must be an overt act shown in order to establish even an attempt. An overt act is one done to carry out the intention, and it must be such as would naturally effect that result, unless prevented by some extraneous cause " (*People* v. *Mills*, *supra*). " Acts in furtherance of a criminal project do not reach the stage of an attempt unless they carry the project forward within dangerous proximity to the criminal end to be attained " (*People* v. *Werblow*, 241 N. Y. 55, 61; *People* v. *Ditchik*, 288 N. Y. 95, 96).

Under our statute making the unintentional killing of another while engaged in the commission of a felony murder in the first degree, the other elements constituting the felony must be so distinct from that of the homicide as not to be an ingredient of the homicide indictable therewith or convictable thereunder (*People* v. *Hüter*, 184 N. Y. 237; *People* v. *Spohr*, 206 N. Y. 516; *People* v. *Moran*, 246 N. Y. 100; *People* v. *Lazar*, 271 N. Y. 27). The precedent felony must constitute an independent crime not included within the resulting homicide (*People* v. *Wagner*, 245 N. Y. 143, 148).

An analysis of the evidence in this case utterly fails to support the contention of the prosecution by proof beyond a reasonable

doubt that the killing of Yost was the act of appellant perpetrated while he was engaged in the commission of attempted robbery. Appellant, as a witness in his own behalf, testified that decedent's death was accidental. The proof adduced to establish his guilt is based very largely upon alleged admissions and an oral and written confession.

The record shows that appellant, twenty-one years of age at the time of his trial, was born and raised in Florida. His parents were divorced and both had remarried; his father residing in Los Angeles, California, and his mother in Fort Myers, Florida. Appellant lived with his mother.

Appellant entered the naval service when seventeen years of age and continued therein for seventeen months. During the period of service he contracted an attack of amnesia and as a result was confined in a naval hospital for about two months and received a medical psychopathic discharge on August 15, 1944.

About April 15, 1946, appellant met Inis Heltz at a night club in Fort Myers. She and her father were residents of Lackawanna, New York, and were spending the winter in Florida. Upon ascertaining that they were planning to return to their home appellant requested and obtained permission to accompany them. They left Fort Myers on April 19th and started north in an automobile owned by Miss Heltz and arrived at Lackawanna on April 26th, where appellant remained until May 1.

On the journey north appellant and Miss Heltz discussed the question of their proposed marriage but fixed no definite time for its celebration.

When leaving Florida appellant had in his possession a .32 Colt pistol. When Miss Heltz observed this weapon she suggested that appellant should get rid of it because it was unlawful to possess it in this State without a permit. She also owned a .38 calibre revolver which she gave to appellant upon their arrival at her home.

During his stay at the Heltz home, which was the only time he was in Erie County, appellant became acquainted with several friends of the father and daughter, among others, a man named Razlag and a man named Pyanowski.

Appellant attempted without success to obtain ammunition for his .32 Colt pistol. He succeeded, however, in obtaining bullets for the .38 gun, some of which were used by himself and Razlag in target practice.

Pyanowski testified that on April 27th he had a conversation with appellant in which the latter stated that he desired to purchase ammunition for his .32 Colt pistol.

Upon the testimony of Pyanowski the prosecution is principally relying to sustain the judgment of conviction. Upon being interrogated by the District Attorney as to the conversation he had with appellant the witness said:

" Q. Did you have any conversation with him aside from discussing ammunition he [appellant] intended to buy? A. Not that I can recall. * * *

" Q. Or any other time that day when you were in the car? A. Why, let's see, I think he mentioned something about if I should ever hear of a stickup, I am not positive whether it was Colden he said, if I should ever hear of a stickup there, to keep quiet about it. I wouldn't swear as to the name of the town.

" Q. Did he say more than that? A. No..

" Q. Well, you testified before the Grand Jury didn't you? A. Yes.

" Q. I call your attention to this question and answer on Page 168 of the Grand Jury minutes and ask you to read it. A. Yes.

" Q. Just a minute, does that refresh your recollection as to any conversation that you had with him about stickups? A. Yes, I remember that one now, now that I read it.

" Q. How could you forget it? A. It is quite some time ago. I thought he was just talking big and didn't pay much attention to it.

" Q. What was the conversation you had with him about stickups? A. Well, he asked me if I would like to make some easy money.

" Q. What did you say? A. Well, I asked him how he was going to go about getting it, then he pulled out a .32 pistol, I think it was chrome plated, and he told me he would get it with this.

" Q. Didn't he also ask you if you knew any place where there was a large amount of money on hand? A. Yes, he did.

" Q. Then he told you if you had heard of a stickup in a certain town, you couldn't recall the name, to keep your mouth shut about it? A. That is right."

Appellant repudiated the testimony of Pyanowski. In this connection it should be borne in mind that appellant, a stranger in Buffalo and its environs, had formed an acquaintance with Pyanowski but two hours prior to the alleged conversation. At that time Yost was unknown to him and he had never heard of

the town of Colden. It is also noteworthy that he made no statement to Pyanowski that he intended to participate in a " stickup ". No claim is made that appellant made any suggestion to Pyanowski that he knew Yost or that the latter had " a large amount of money on hand ". Certainly Pyanowski communicated no such information to him. Moreover there is not the slightest bit of evidence in this record to substantiate any claim that Yost was the possessor of " a large amount of money " or, for that matter, of any valuable property which would warrant an attempt to rob him. If the fact were otherwise surely the police authorities, in their search for incriminating evidence, would not have overlooked such an important matter.

We will now discuss the occurrence of May 1, 1946, and the events subsequently thereto. In the early afternoon of that day appellant and Miss Heltz started for a ride in the latter's car. Appellant had in his possession the .38 pistol, the property of his companion. They stopped at the tavern conducted by the deceased and purchased several bottles of beer and then departed. An hour or so later they again returned and on this occasion appellant entered the tavern alone while Miss Heltz remained in the car. She testified that while appellant was in the tavern she heard a " loud noise, like a chair being tipped over " and that appellant came running out of the tavern, got into the car and asked her for the shortest route to Buffalo. She also testified that appellant informed her that she was right about the fact " that the gun might get him in trouble, and that he was afraid it had."

After leaving the tavern appellant and his companion drove to the latter's home where he obtained his clothing. He requested her to drive him to Cleveland. They had less than ten dollars between them. Miss Heltz borrowed five dollars from a friend and the journey to Cleveland was begun. En route they agreed to be married and to continue the trip to Los Angeles to visit appellant's father.

They arrived in Cleveland in the early morning of May 2d. There Miss Heltz sold her car for $550 and gave appellant $200 from the proceeds of the sale price. From Cleveland they went by train to Chicago where they arrived on May 3d. While in Chicago they made inquiries about a marriage license but failed to obtain one because of a three-day waiting period. They spent the night in that city and on the following day boarded a bus for Los Angeles and arrived at Omaha on May 5th where they spent the night. At Chicago and Omaha they used assumed names.

On May 6th, while Miss Heltz was absent from the hotel in which they were staying appellant left a note for her to the effect that he had to leave, that he would write to her later and suggested that she should obtain a job and wait for him.

Later the same day Miss Heltz left for Denver and remained there until May 13th when she was apprehended as a material witness and returned to Buffalo.

After leaving Omaha appellant went to Los Angeles and spent about a week there with his father. During his visit he intercepted a telegram from his mother addressed to his father to the effect that appellant was wanted for murder in Buffalo. Without disclosing the contents of the telegram to his father appellant left for Phoenix, Arizona, and there obtained employment in a restaurant under an assumed name.

On June 11th he was taken into custody by Phoenix police officers and on the same day he made an oral and a written statement to them. Three days later he made and subscribed a statement at the request of the District Attorney of Erie County.

Except for immaterial details the three statements are substantially identical. They recount many of the incidents to which we have heretofore referred and in addition there is included in them a resume of the events culminating in the killing of Yost. In that connection appellant said: "When we came back to Glenwood, I decided to have another beer at the tavern we had previously visited. * * * I went in, ordered a bottle of beer and drank part of it. I was the only person besides the bartender at the time. I talked to him a while and the next thing I remember, the bartender was ducking behind the bar and I was shooting at him with a pistol I carried. I fired two or three times, this with a .38 nickel plated revolver, which breaks at the top to reload. The bartender was an elderly man. I did not know at that time whether I hit him or not. I then ran outside, got in the car and drove away. * * * At the time I entered the tavern in Glenwood, New York, I had no intention of shooting the bartender ".

In response to the following questions by the District Attorney of Erie County, he made the following answers:

" Q. From what you say in this statement [referring to that made to the Phoenix police], it is indicated that you suddenly realized you were shooting at the man and then ran out of the place. Is that right? A. That's right, I guess.

" Q. You didn't take anything from the place or try to hold him up? A. No.

" Q. If you had no idea at all to commit a crime and this shooting occurred as you say it did, why didn't you wait to see what condition he was in and help to get a doctor and take care of him? A. I guess I was pretty scared.

" Q. Why? Why were you scared if you just realized you had shot somebody with no purpose or intent at all? A. You'd be scared, too, if you had shot a man. * * *

" Q. Then, immediately after you realized that you had shot this man, you stated to me that you immediately left the tavern, went out, got into the car and drove away. Is that what you told me yesterday? A. Yes, I guess so.

" Q. And that you didn't burglarize the place or carry any money from the establishment? A. No. If I had wanted to hold the old man up all I had to do was grab hold of him. He was an old man.

" Q. How did you happen to pull the gun out? A. I don't know."

At the trial appellant testified that immediately preceding the discharge of the gun he was engaged in conversation with Yost about firearms. The latter asked to see the .38 revolver and appellant complied with the request. Yost then said he had an old relic (gun) of his own. Appellant's testimony then continued:

" I asked him if I might see it, and he said ' Yes '. He started to turn around like this in the bar (indicating). As he started around he held my gun out to me like that (indicating). I told you I was sitting on the stool. I was back a little to the bar, because of my legs. I was smoking a cigarette, I smoke a great many. I put the cigarette to my mouth, reached for the gun; as he handed it to me, but I didn't quite get the gun, it fell, it fell out of his hand, you know, I saw it was going to fall, I made a grab for it. I kind of jumped for it, knocked my stool back.

" Q. Then what happened? A. The gun went off.

" Q. Was the gun in your hands when it went off? A. No, it wasn't. I made a grab at it, but I did not get the gun.

" Q. What position was Mr. Yost in at the time this happened? A. He was turning around and reaching with his hand for stuff, I don't know what he reached for, down like that (indicating).

" Q. The gun went off, did it? A. Yes, when it fell.

" Q. What did you do? A. What did I do? Well, I was scared stiff for a minute. I just stood there.

"Q. What happened to him, what did he do? A. Why, he just went on down.

"Q. He what? A. He just went on down.

"Q. What do you mean by 'Went on down'? A. Just sank down on the floor.

"Q. Sank down on the floor? A. As far as I could see. I couldn't see him hit the floor.

"Q. What did you do then? A. I leaned over the bar, it is not so tall or wide.

"Q. Go ahead. A. I leaned over, I asked him, I said, 'What is the matter, what happened?' I did not know whether the thing had scared him as bad as it had me, or what. He did not answer me, and I looked for a second, I didn't stay there * * *

"Q. Then what did you do? A. I didn't see anything wrong with him. There was no blood or nothing. I got scared. I had the gun out, Inis had told me about this law. I was scared. * * * I was just scared stiff. I didn't know if anybody heard the shot and would come around to arrest me, anyway, I got out of there."

Whether we accept as true the statements made by appellant to the investigating officials, or his explanation at the trial as to how the death of Yost occurred is of no importance. Concededly he was mistaken when he said he fired two or three shots. One, and only one bullet was discharged. If he was endeavoring to give a truthful narrative in the statements then obviously he was emotionally unstable — his mind was diseased. If he told the truth at his trial then the death of Yost was accidental. There is no evidence in the record before us which warrants the conclusion that appellant was attempting to commit, or, was actually engaged in the commission of, robbery at the time Yost's death occurred. Nothing was taken, nothing was attempted to be taken, by appellant from the deceased or from his premises. If appellant's motive was robbery nothing intervened to prevent its successful consummation. The fact that he fled from the scene of the shooting carries with it no inference of guilt of the crime of attempted robbery. Unquestionably, as he said, fear was the cause of his flight.

This case should not have been submitted to the jury on either of the murder counts in the indictment. Taking the view of the evidence most favorable to the prosecution, if appellant is guilty of any crime, at most it is that of manslaughter and that is the only issue which should have been left to the jury.

The charge of the trial judge makes it crystal clear that he was convinced that appellant was guilty of felony murder. True he did define in a perfunctory manner murder in the first degree under subdivision 1 of the statute and also murder in the second degree and manslaughter in the first degree. The charge as a whole, however, related almost exclusively to felony murder. In fact the trial judge told the jury that they should first consider and decide that question. This procedure has been very recently condemned by three judges of the Court of Appeals (*People* v. *Snyder,* 297 N. Y. 81). When the jury after deliberating about five hours returned into court and asked for further instructions as to the different verdicts they might render the judge proceeded anew to define and discuss felony murder. He concluded his remarks by saying: " The defendant claims that it was an accident; the People claim it was attempted felony." Upon being advised that the jury required no further information the judge said: " First consider the felony part of it, whether or not this was an attempted hold-up. If you find there was not an attempted hold-up, why, then, go to the other charges."

No impartial judge can read the charge without concluding that it was highly prejudicial to the accused and deprived him of a fair trial which the law guarantees to the meanest criminal in the land.

The judgment of conviction should be reversed on the law and facts, and new trial granted.

HILL, P. J. (dissenting). Appeal from a judgment convicting defendant of first degree murder committed while attempting a felony, and from an order denying his motion to set aside the verdict and for a new trial. The jury recommended, and he was sentenced to, life imprisonment. The indictment contains two counts, the first for the killing of John Yost by deliberate and premeditated design; the second charges that defendant feloniously shot and killed Yost while engaged in the commission of the felony of attempted robbery in the first degree.

Yost conducted a gasoline filling station and restaurant or tavern in a rural section of Erie County, in the town of Colden. He had a license permitting the sale of beer.

Defendant met Inez M. Heltz at a dance hall in Ft. Myers, Florida. She was a young woman who was in Florida with her father for a month or two. Defendant asked leave and was permitted to accompany them north in her car. They arrived

in Lackawanna, Erie County, on April 26, 1946. He stayed at the Heltz residence until May 1st when he shot and killed John Yost. He fled, accompanied by Miss Heltz, whom he abandoned at Omaha, and was later apprehended in Phoenix, Arizona.

The defendant Woodley was about twenty-one years of age at the time of the shooting. He was a native of Ft. Myers, Florida. He says that he had gone through three grades in the junior high school and two of the three grades in the senior. His father and mother were divorced; she had remarried and lived in Florida; the father had remarried and lived in California. From an official medical record it appears that he enlisted in the Navy on March 12, 1943, and was discharged about August 15, 1944. He left his ship without leave early in 1944, was apprehended and sent to the medical Naval Hospital at Bethesda, Maryland, and a medical officer certified in a report contained in an exhibit placed in evidence by defendant's counsel: " It is the opinion of the Board that this man is undesirable material for further retention in the Naval Service because of his basic personality defect. It is further the opinion that his 'amnesia' was on the conscious or near conscious level, that he was mentally competent at the time of his unauthorized absence and is now competent to stand trial and punishment. He is competent to be discharged into his own custody without danger to himself or others and he is not likely to become a public charge. He is not fit for any type of duty."

Coming north with the Heltzes he exhibited a pearl-handled .32 calibre revolver, but had no ammunition. Miss Heltz owned a .38 calibre revolver, old type, short barrel, nickel-plated, which she loaned or gave to the defendant. He obtained ammunition and used it on one or more occasions in target practice.

On the day of the shooting, he and Miss Heltz went riding in her car. He had the .38 calibre revolver. They stopped at the Yost restaurant and drank one or more bottles of beer, then continued on a leisurely ride through the countryside and returning, when near the vicinity of the Yost restaurant he inquired if she would like another drink. She declined. He drove the car a little ways off the road and some distance from the restaurant, went in and after fifteen or twenty minutes came out. Miss Heltz describes the transaction:

" Q. Well, did you think you had been there 10 minutes or 15 minutes or 20 minutes? A. Oh, at least 15 minutes.

" Q. And what next occurred? A. Well, I was sitting in the car —

" Q. Speak up, please. A. While I was waiting I heard a loud noise, sound.

" By the Court: Q. Heard what? A. A loud noise, like a chair being tipped over; and then he came out.

" By Mr. Dwyer: Q. Woodley came out of the tavern? A. Yes.

" Q. How did he come out of the tavern? A. He came running out of the tavern.

" Q. He came running out of the tavern? A. Yes.

" Q. What did he do? A. He opened the car door and got in.

" Q. Did he say anything to you as he got in? A. He asked me the shortest route back to Buffalo. * * *

" Q. When did he say something more to you? A. After we pulled away.

" Q. What did he say then? A. The car was in motion. Something about my having been right.

" The Court: What? The Witness: About my having been right about the fact that the gun might get him in trouble. * * *

" Q. Well, he said something about your being right about what? A. He seemed upset, and his being upset I became upset, and I can't recall his words, and I would not attempt to quote anything that I wasn't sure of.

" Q. Well, tell us now just what you recall of what he said to you as you got in motion, pulling away from the tavern? A. Something to the effect about my having been right about his having the gun, that it would get him in trouble."

After following cross-country roads the couple arrived at the Heltz home where the defendant obtained his clothing, the young woman borrowed $5 from a friend and drove with the defendant to Cleveland, selling the car there for $550, $200 of which she gave to him. They had talked of being married and going on to the Pacific coast. They went by train to Chicago, registered at a hotel as man and wife the following day boarded a bus, intending to go to Los Angeles, but stopped at Omaha where they again registered as man and wife, and remained one or more days. While she was out of their hotel room he left, and upon her return she found a note saying that he would write to her in a few days, and advising her that she " Get a job and wait for me." He says he went to California, stayed about a week with his father and that he left Los Angeles because he saw a telegram from his mother to his father, the substance of which he says was: " Something about I was wanted for murder; or something like that, by the Buffalo police;

if dad was to see me to tell me give myself up, arrange to surrender, or something like that. I don't know. I have forgotten the main part of it."

He then proceeded to Phoenix where he was arrested.

To sustain the theory of robbery, the People rely upon the defendant's desire to obtain a gun and ammunition and his conversation, particularly with Pyanowski, an acquaintance he had made after coming north, who testified:

" Q. What was the conversation you had with him about stickups? A. Well, he asked me if I would like to make some easy money.

" Q. What did you say? A. Well, I asked him how he was going to go about getting it, then he pulled out a .32 pistol, I think it was chrome plated, and he told me he would get it with this.

" Q. Didn't he also ask you if you knew any place where there was a large amount of money on hand? A. Yes he did.

" Q. Then he told you if you had heard of a stickup in a certain town, you couldn't recall the name, to keep your mouth shut about it? A. That is right."

While at Phoenix he wrote two letters intended for his mother in which he says that he is a little hazy about what happened, and one contains the sentence, " That was a foolish thing that I did and I'll most likely regret it the rest of my life." The other contains the following: " Please forgive me for what happened. I still don't know everything that happened. If there was a chance I'd give myself up, but I'd only serve a life term for nothing. * * * P. S. I'm *not* giving up. They'll have to kill me first so don't turn me in."

Defendant's conduct seems a mixture of avariciousness, viciousness and stupidity. On the second occasion, he went into this restaurant and waited until two customers had left. He knew that there was money in some amount in the till. He shot and killed the proprietor and fled. It is a bit difficult to discern the exact line of defense which was interposed in his behalf. A motion was made in advance of the trial at a Special Term " for an order requiring the District Attorney and/or the Sheriff of Erie County to allow the defendant or his attorney to examine a certain statement and an alleged diary belonging to the defendant and to have possession of the originals or photostat copies thereof, and for such other, further and different relief as may be just." In the affidavit by defendant's counsel filed in support of the motion it is stated that he learned from the defendant's medical history that he had received " childhood

brain injuries; that it is the desire of this deponent to have this defendant carefully examined by a Psychiatrist; that deponent has consulted a Psychiatrist and informed him of the facts herein alleged and that said Psychiatrist informed deponent that before making said examination he desires all facts, writings and statements made by the defendant and samples of his hand writing in order to arrive at an accurate conclusion as to the mental condition of the defendant ''. This statement is supported by a physician. The motion was opposed and denied. It is understandable that a district attorney about to prosecute a defendant for murder would hesitate to turn over all the evidence which he had in his possession. A plea of not guilty was entered to the indictment. If his counsel had desired to test defendant's mentality in advance of the trial, a plea of not guilty with specifications of insanity could have been entered (Code Crim. Pro., § 336). Had the defendant's counsel at any time during the trial, before judgment, wished to have defendant examined as to sanity, a motion therefor could have been made. (Code Crim. Pro., § 658.) This was not done, and there was no request that the court charge concerning defendant's mentality or his ability to form and carry out an intent.

Defendant asks a reversal on the grounds that there is not sufficient evidence to show an intent to commit robbery. The evidence in this regard is weak. However, with no other possible reason defendant shot and killed this elderly man and fled. He had talked in a silly and loose manner about holdups, and was quite obviously of weak mentality. His counsel in the argument and in the brief on appeal sought to raise the issue of mental capacity. Acquittals in the past where the defendant's mentality was indirectly made an issue constitute a not too praiseworthy record in our judicial history. The Legislature, undoubtedly because thereof, authorized the trial of that kind of an issue at any time, separate and distinct from the criminal issue. This, defendant and his counsel elected not to do, and they should not be permitted to raise that collateral issue on this appeal.

Two technical issues are raised. The court stated in the charge, '' And in determining the weight you desire to give to the testimony of this defendant you may take into consideration that he stands here charged with a serious criminal offense.'' This was excepted to by defendant's counsel. The court had charged that the indictment raised no presumption of guilt and stated to the jury that they were the sole judges of

facts, and all of the reasonable doubt and other protective theories with which we surround a defendant. The statement quoted is of doubtful propriety, but where the issue of fact as to the killing is hardly at issue, the error is not sufficient to require or permit a reversal.

The other technical objection involves a portion of the charge quite similar to that discussed in the main opinion in *People* v. *Snyder* (297 N. Y. 81). The Court of Appeals in the *Snyder* case reversed a conviction of murder by a vote of four to three. Three of the judges concurred in what is called the " main " opinion, the fourth judge concurring for reversal did so in a separate opinion which did not discuss the question which is raised on this appeal. Three judges dissented and voted to affirm. This objection has to do with the direction as to the order in which the jury should conduct its deliberations. The charge contains the following: " You are, therefore, to determine, first, did the defendant intend to commit any robbery, and, if so, did he, in the course of such attempted robbery, kill the deceased Yost? "

The trial judge applied the same orderly procedure to his own charge for he stated earlier: " I will first discuss felony murder, which is the charge which the People claim they have proven beyond any reasonable doubt."

The court, carrying out his theory of order, later in his charge says, " If you come to the conclusion, after considering the evidence, that the killing of the deceased did not occur while the defendant was engaged in the commission of an attempted felony, then you may consider the other forms of homicide. That is, the other count in this indictment, which charges premeditated murder in the first degree." He later properly defined murder in the second degree, manslaughter in the first degree and not objectionably defined intent and premeditation, even the linguistic derivation thereof.

The charge by the court was fair and met all requirements of applicable statutes. Concerning the advice to the jury as to the order which should be adopted, it did not differ from hundreds of charges made in the past and not disapproved by the court of last resort. Defendant's counsel made no objection on the trial. The *Snyder* case was considered by the Court of Appeals after this charge was made, and the defendant's counsel now raises the issue. In the state of the record, under the divided vote in the *Snyder* case, this charge does not require a reversal, and if in fact erroneous, it is covered by section 542 of the Code of Criminal Procedure.

Defendant's act resulted in the death of Yost. A jury considering the matter recommended mercy and life imprisonment rather than the death sentence.

The judgment of conviction should be affirmed.

FOSTER and RUSSELL, JJ., concur with HEFFERNAN, J.; HILL, P. J., dissents in an opinion in which BREWSTER, J., concurs.

Judgment of conviction reversed, on the law and facts, and new trial granted.