THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v SOLOMON VANN, Appellant.

First Department, November 18, 1976

*Steven Lloyd Barrett* of counsel *(Lawrence H. Sharf* with him on the brief; *William E. Hellerstein* and *William J. Gallagher,* attorneys), for appellant.

*Norman Barclay* of counsel *(Peter L. Zimroth* with him on the brief; *Robert M. Morgenthau, District Attorney),* for respondent.

*Per Curiam.* Twenty-four years after a jury found the defendant Vann guilty of murder and he was sentenced to life imprisonment, he raises now, for the first time, his claim that his trial was unfair. We agree.

He seeks a reversal of his conviction and a new trial, or in the interest of justice a dismissal of the indictment due to the impossibility of retrial. We would reverse and order a new trial.

A brief reference to the procedural steps leading to this appeal and to the circumstances leading to defendant's conviction is appropriate.

On December 11, 1952 Vann was sentenced to life imprisonment following his conviction for murder in the first degree (former Penal Law, § 1044, subd 2 [felony murder]) after a trial before J. GOLDSTEIN, J., and a jury.

Beginning in 1968 Vann moved on three occasions for writs of error *coram nobis* to set aside his conviction on various grounds, the last resting on his claim that the statements attributed to him at his trial were not voluntarily made *(People v Huntley,* 15 NY2d 72). His claim met with no success *(People v Vann,* 25 NY2d 753).

The appeal before us is, however, from a judgment of the Supreme Court, New York County (SCHWEITZER, J.), rendered May 12, 1970, resentencing Vann *nunc pro tunc,* pursuant to *People v Montgomery* (24 NY2d 130), as of the date of his original sentence on December 11, 1952.[1] Hence Vann is

---

1. We note that the series of *coram nobis* applications instituted by the defendant were initiated after 1967 when our new Penal Law was adopted in which the death penalty, in cases such as the one at bar, was eliminated. The failure of many defendants to appeal convictions for murder in cases where lengthy prison sentences were imposed may be attributed to a defendant's fear that a new trial might result in an imposition of the death penalty.

Judge BREITEL, now Chief Judge, had occasion to comment upon a defendant's

permitted now to bring this appeal. Since November 1972 Vann has been free on parole.

The main claims now asserted by Vann are three:

(1) That the trial court improperly and unfairly instructed the jury on the issue as to whether statements attributed to the defendant were voluntarily made.

(2) That the trial court in its conduct at the trial was not impartial, that through its questioning of the prosecution's witnesses and the defendant, suggested to the jury it was convinced of defendant's guilt.

(3) That the prosecutor's summation encompassed such prejudicial misconduct as to preclude a fair determination of the facts by the jury.

We now turn to the circumstances developed at defendant's trial:

On Saturday, August 30, 1947, at about 4:00 P.M., William "Slim" Dunn, a "policy" banker, was shot and killed in the interior hallway of a Harlem apartment building located at 226 West 142nd Street. The case remained unsolved until January 1951, when Detective James Harding arrested Edmund Kidd and James "Moose" Felder.[2]

Felder gave a written statement to Harding which, in pertinent part, revealed that: He (Felder), Kidd, James Lee Hines and Allan Stewart met on the corner of 144th Street and decided to rob Dunn; Felder and Hines entered the building where Dunn was killed, Kidd remaining on the stoop and Stewart across the street as lookout; Dunn ran and Hines shot him and took his money. Harding sent for an assistant District Attorney and in a transcribed statement Felder made

---

failure to appeal a 1957 conviction for murder in the second degree until 1968: "It should also be kept in mind that in 1957, if there were a reversal and a new trial, defendant Montgomery might still have been convicted of a capital crime *(People v Montgomery,* 24 NY2d 130, 135 [dissenting opn]).

In *Stroud v United States* (251 US 15), the imposition of the death penalty following a second trial, although the defendant was sentenced to life imprisonment following his first trial, was not barred by the double jeopardy provision of the Constitution.

2. Recently, Detective Harding has had his own troubles with the law. Indicted in two separate counties for grand larceny and official misconduct emanating from the "shake down" of policy operations, he stands convicted of the one and retrial of the other *(People v Harding,* 37 NY2d 130), on remand 48 AD2d 1014, affg NYLJ, July 21, 1975, p 11, col 8; *People v Harding,* 44 AD2d 800). Ironically, Vann complained at trial that Harding tried to shake him down and threatened to run him out of Harlem if he did not confess.

no mention of Stewart and claimed he did not know the robbery was to take place.

Harding then brought Kidd into the room and Kidd told a story substantially similar to Felder's first account and thereafter Felder confirmed his original story.

Neither Felder nor Kidd made any mention of defendant herein, Solomon Vann, Jr., and both agreed that Hines was the gunman.

Next, in March 1951, Harding went to Greenhaven Prison and returned to New York with Hines who was then serving a 10 to 20-year sentence for a robbery and shooting. At 27 years of age, Hines had spent half his life in prison. For one week, Hines was repeatedly questioned about the Dunn killing but refused to co-operate. Finally, at the urging of his family, Hines made the following statement: He (Hines), Kidd, Stewart, George Reed, Bobby Lee (unindicted) and the defendant herein, Solomon Vann, Jr., were on the corner when Felder approached and suggested robbing Dunn; Hines devised the plan to commit the robbery—Kidd, Hines, Vann and Stewart were to go into the hallway after Reed placed a bet with Dunn (to distract him); Kidd had the gun; Vann and Stewart did not enter the hallway for some reason; Dunn put up a struggle and Kidd shot him; the proceeds of the robbery were split up later at Vann's apartment.

Following the statement taken from Hines, Harding arrested Vann and then Reed.[3] Vann was taken into custody at about 12:00 midnight on March 21, 1951. Eventually, after three hours, Vann gave an account similar to that offered by Hines, to wit, he was a "lookout" and that Kidd did the shooting. This statement was not reduced to writing by Harding. Harding called the same Assistant District Attorney, who told him to bring Vann to his office in the morning.

Vann did not see the assistant until the afternoon of the next day, March 22.

At that time, Vann initially denied that he knew his friends were going to commit a robbery. Then, when confronted with Hines, Vann admitted that he knew the group was going to commit a robbery. But when the stenographer was called, Vann once again refused to admit that he knew that a

---

3. Under Hines' statement, Kidd was the gunman and Stewart and Vann never entered the building.

robbery was going to take place. Vann was first arraigned 35 hours after his arrest.

Hines later became the star witness for the prosecution at the trials (there were two—the first before VALENTE, J. at which Kidd was convicted of murder and given a life sentence and Stewart was acquitted; the jury was hung on Vann, Felder and Reed; and the second before GOLDSTEIN, J. at which Vann, Felder and Reed were retried).

At the second trial, Felder and Reed entered pleas of guilty to manslaughter in the first degree and received sentences not to exceed seven years and Vann was convicted of murder in the first degree.[4] Hines, named as the gunman by Kidd and Felder, was permitted to plead guilty to manslaughter in the first degree and received a 3 to 6-year sentence to run concurrently with the 10 to 20-year sentence he was then serving.

Vann's guilt was premised on the testimony of accomplice Hines and his own statements made to Harding and the Assistant District Attorney. At trial, Vann claimed that he was consistently mistreated by Harding, which Harding denied, and therefore made the statements admitting complicity; he claimed he was not at the scene at the time of the shooting. At best, the conflicting statements of all defendants as well as Vann's showed only that Vann was a "lookout" in a spontaneously formed plan to rob Dunn. Depending on which statements are credited, either Kidd or Hines did the shooting.

Vann, an honorably discharged veteran who served overseas in World War II and who had two prior arrests as a "numbers runner", spent the major portion of his adult life— 22 years—in jail on this conviction notwithstanding Judge GOLDSTEIN's and the prosecutor's recommendation at the time of sentence that the Governor commute the life sentence after 7 years.

On this appeal, Vann complains that Judge GOLDSTEIN failed to charge the jury that they should consider all factors —prearraignment delay, lack of food, mistreatment—in determining whether the statements were voluntary. Judge GOLDSTEIN charged that these factors may be considered only in determining whether the statements were made as a result of fear produced by threats or beatings, and that if the statements were not the result of fear produced by threats or

---

4. Vann was urged to plead guilty by the court and his lawyers.

beatings, then the jury was to consider them in determining guilt.

Section 395 of the Code of Criminal Procedure, in effect at the time, read, in pertinent part, that: "A confession of a defendant * * * can be given in evidence against him, unless made under the influence of fear, produced by threats." But the case law was then clear, and we have noted that Judge VALENTE so charged at the first trial, that the jury should determine whether the statements were voluntary, considering all the factors, and, if not voluntary, that the statements may not be considered (see *People v White,* 176 NY 331, 349-350; *People v Rogers,* 192 NY 331, 346-348; *People v Fernandez,* 301 NY 302, 326-327).[5] Judge GOLDSTEIN, at this trial, narrowly limited the jury's review of the evidence to a finding whether the statements were the result of fear produced by threats or beatings, rather than on the broader, and proper, scope, whether the statements were voluntary under all the facts. And, in the context of this case, this error was prejudicial.[6]

In addition, Judge GOLDSTEIN, unlike Judge VALENTE, failed to adequately explain to the jury the difference between a statement, an admission and a confession. In fact, Judge VALENTE at the first trial specifically charged the jury that Vann's stenographically recorded questions and answers made to the prosecutor were not a confession. At the trial, Judge GOLDSTEIN referred to all statements as confessions. This, too, was prejudicial because, first, it misinformed the jury as to the nature of the statements and, second, precluded a proper evaluation of the statements by the jury, to the defendant's detriment.

Also prejudicial was the court's charge on the significance to be attached to the delay—some 35 hours—between arrest and arraignment. True, the "confession"—oral and unrecorded—to Harding was allegedly made only three hours after the midnight arrest, but the oral "confession" to the Assistant District Attorney was made the following afternoon. And the court was in error in failing to charge, as defense counsel requested, that the delay in arraigning Vann was unlawful *(People v*

5. It will be recalled that there was a "hung jury" as to Vann at this trial.

6. It is, of course, of no consequence that Vann's *coram nobis* application, resulting in a *Huntley* hearing, met with no success (25 NY2d 753) since the jury, at Vann's second trial, was never afforded the appropriate opportunity to review the question of voluntariness, as they must *(People v Huntley,* 15 NY2d 72).

*Alex,* 265 NY 192; *People v Snyder,* 297 NY 81, 91-92; *People v Lovello,* 1 NY2d 436, 438). Under *Alex (supra),* the question of unnecessary delay was to be considered also on the issue whether the statements attributed to the defendant were voluntarily made and was not limited merely to the issue whether, as charged by the court, the "confessions were made because of fear produced by threats or beatings". Thus the court's charge on this score was woefully deficient and ignored the issue of voluntariness. When Vann's counsel later excepted to the charge, the error was not cured by the court's response "I did not so fail to charge" and, if so, "I now so charge".

As to the Trial Judge's conduct at the trial: The pages of the record yield a flavor of judicial partiality obviously pro-prosecution and anti-defendant.

After perusing the record, we agree with appellate counsel's observation that no other witness was examined and cross-examined by the court to any comparable extent as was the defendant, and no other witness but the defendant was confronted with rhetorically hostile inquiries, and no other witness was asked questions prefaced by expressions "do you now tell us" and "you now say", and that in many instances the court by parallel questions emphasized points established by the prosecution's questioning of defendant.

Many instances of partiality could be cited. One will suffice to justify our conclusion that the court's attitude towards the defendant was noticeably unfair.[7]

---

7. This conclusion is fortified by the minutes of sentence. Prior to the moment of sentence when the trial court had the option of accepting the jury's recommendation of life imprisonment or imposing a death sentence the court dangled its choices before the defendant in open court so as to compel the defendant to retract the testimony concerning Harding that he gave at the trial. In a series of answers to the court, Vann said that he lied as a witness at the trial. It is inescapable that these answers were coerced by the court's statement to Vann at the outset of interrogation:

"THE COURT: Vann, I want you to understand this. A life-saver when he wants to save someone's life and the person to be saved does not help, the life-saver knocks the man out and drags him in and then revives him after he has him on shore. Do you understand that?

"DEFENDANT VANN: Yes.

"THE COURT: We in the Court cannot do that and even if we could, we are not allowed to do it. Now I want nothing but the truth from you. If you insist on lying, there is no reason why I should extend myself to try and help someone that continues to lie."

Such extraordinary behavior, in an effort to vindicate Harding, cannot be squared with the impartiality demanded of judicial officers at all times.

Vann had testified that the tactics Harding used on him at the precinct changed when they reached the District Attorney's office, that Harding sought to persuade him that an implicatory statement by Vann to the Assistant District Attorney would improve Harding's opportunity for promotion in the Police Department, and that Vann would not thereafter be bothered as a policy collector. Vann testified that he had given just such testimony at the first trial, which claim was challenged immediately by the prosecution. At that point the court asked the following series of questions:

"Q. Now, Vann, you have taken the minutes to what you testified at the last trial?

"A. That's right. * * *

"Q. During the recess, will you again take that record and when you come back after lunch see whether you can find any such statement in the record."

At recess, the court again instructed Vann, in the jury's presence, to search for that testimony. No reply was made by Vann, and in summation, the Assistant District Attorney explicitly reminded the jury of this incident and Vann's failure to return with such testimony.

The truth is that Vann did so testify to virtually the same effect in both the first trial and on direct examination in the second trial—that Harding told him that if he failed to make a statement, Harding would have the inspector's men drive Vann from Harlem and he would be unable to make another dollar from policy.

This incident further contrasted with a parallel incident during Harding's cross-examination, also in full view of the jury. Harding maintained that he had testified in the first trial, like the second, that he had fed Vann while they were in the District Attorney's office. Defense counsel disputed this, and asked Harding to find it in those minutes. The court stated: "I am not going to have this witness examine hundreds of pages of minutes".

We must note that the court commented in the charge that if the jury concluded that the defense was false and intentionally interposed, it had a right to consider it in deciding Vann's guilt. The instruction did not include a caution as to the weakness of such evidence. *(People v Leyra,* 1 NY2d 199; *People v Russell,* 266 NY 147.)

The third point raised by the defendant concerns alleged

prosecutorial misconduct by the Assistant District Attorney in his summation to the jury. The Assistant District Attorney, without having been sworn as a witness at the trial, gave the jury his version of the circumstances concerning his first meeting with Vann in the District Attorney's office when he was accompanied by Harding and the reason why Vann was not booked. The Assistant District Attorney informed the jury that delay in arraigning Vann occurred "because I had told Harding to bring him down to the office where I would take a statement from him". He also told the jury it was his better judgment to question the defendant in the District Attorney's office later on the 22d than to go to the precinct in the early hours of the morning, and he argued that in his view the delay was justified. He told the jury, without taking the stand, that the reason he was unable to question Vann until the afternoon of the 22d was the possibility that he was engaged in other court business at that time.

He then continued to tell the jury:

"When I got back, I confronted Hines and Vann. Then I questioned Vann and he admitted to me, gentlemen, that he knew they were going to stick up a policy man, and when he did that, I called for a stenographer. The stenographer, as the evidence shows, was up on the 7th floor, just one flight up, and he had to come down—and what difference in time would there be to come from the 7th floor to the 6th floor? When I took the statement from Vann he again denied that he knew there was going to be a stick-up of a policy man, and I asked him:

" 'Q. Didn't you tell us before when we were speaking to you'—and this is in the statement I took that day—'Didn't you tell us before when we were speaking to you when you left 144th Street, you knew they were going to take somebody but you didn't know who"

"A. No, I did not say that.

"Q. Did you tell us that?

"A. No.

"Q. Do you deny you told us that?

"A. I deny that.

"Did I just pick that up from thin air and throw it in? Does that sound as if this defendant was in such great fear of anyone?"

The prosecutor informed the jury that if Vann had said he

was at a baseball game, "and I withheld it, I should be on trial here, not the defendant". Moreover, Vann could not possibly have remembered being at a game on that date; "I can't even remember where I was on the morning of March 22nd". Referring to the defense contention that arraignment had been delayed illegally, the Assistant District Attorney commented: "I do not believe that this was an unnecessary delay. I wanted to get the statement; I thought it was necessary in the interests of justice to get a statement from him. But was he forced to give that statement? Definitely not."

We cannot avoid observing that at the first trial before Judge VALENTE the prosecutor took the witness stand as a witness for the People in the case which he himself was prosecuting. He then said: "I am not apologizing for taking the stand here. * * * [C]an you imagine how these attorneys would have shouted and what they would have said if I had not taken the stand—in view of what Felder had said occurred during that statement and what Vann said happened in my room? How these attorneys would have shouted if I had not taken the stand."

At the second trial the Assistant District Attorney should not have made the comments that he did without his own testimony in the record as a base for his argument. *(Berger v United States,* 295 US 78; *People v Tassiello,* 300 NY 425, 430; *People v Swanson,* 278 App Div 846, 847.)

In these circumstances the Assistant District Attorney became an unsworn witness for the prosecution in a case where the accomplice testimony for the People was unsavory, the testimony of Detective Harding was based completely on Harding's recollection as to statements made by this defendant (and other accomplices) without one supporting note, and where the statements attributed to the defendant himself had been characterized repeatedly by the presiding Judge as confessions.

In this context the unsworn testimony of the prosecutor undoubtedly could not help but move the jury along to find that the State had proven its case beyond a reasonable doubt. While it has been argued that trial practice of an earlier day did not place upon attorneys the stringent standards which are now applied (but, see, *Berger v United States, supra; People v Tassiello, supra),* the defendant's right to a fair trial cannot be ignored by the mere passage of time.

In sum, the cumulative effect of the errors and conduct

outlined above served to deprive Vann of a fair trial. Accordingly, the judgment should be reversed, on the law and in the interest of justice, and a new trial ordered.

MURPHY, BIRNS, SILVERMAN, CAPOZZOLI and LANE, JJ., concur.

Judgment (resentence), Supreme Court, New York County rendered on May 12, 1970, unanimously reversed, on the law and in the interest of justice, and a new trial directed.