256 F.2d 7
 UNITED STATES of America, ex rel. William WADE, Relator-Appellant,
v.
J. Vernal JACKSON, Warden of Clinton Prison, and The People
of the State of New York, Respondents-Appellees.
 Nos. 366-367, Dockets 24380, 24805.
 United States Court of Appeals Second Circuit.
 Argued April 18, 1958.
Decided May 19, 1958, Writ of Certiorari Denied June 9,
1958, See 78 S.Ct. 1152.
 
 Henry C. Roemer, Jr., and Philip C. Potter, Jr., New York City, for relator-appellant.
 George K. Bernstein, Deputy Asst. Atty. Gen., State of New York (Louis J. Lefkowitz, Atty. Gen. of the State of New York, Paxton Blair, Sol. Gen., Albany, N.Y., Samuel A. Hirshowitz, Asst. Atty. Gen., and Michael Freyberg, Asst. Atty. Gen., on the brief), for respondents-appellees.
 Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.
 LUMBARD, Circuit Judge.
 
 
 1
 The question for decision is whether William Wade's confession, obtained during a detention of 23 hours, was involuntary so that its use by the state in order to convict him for felony murder[1] in the Westchester County Court was in violation of his constitutional rights. Wade was tried as a principal who aided and abetted three inmates of Sing Sing Prison who while they were escaping killed a prison guard.
 
 
 2
 We find on the admitted facts that Wade's confession was involuntary and thus its use was in violation of due process of law guaranteed by the Fourteenth Amendment, and that without the confession there was insufficient evidence to convict Wade. As Wade's further detention under sentence of life imprisonment is unwarranted we reverse the order of the District Court for the Northern District of New York which denied him the writ of habeas corpus and direct that the writ issue forthwith.
 
 
 3
 At the trial which resulted in Wade's conviction in June 1941 for felony murder committed on April 14, 1941, he objected at every point to the introduction of his two unsigned question-and-answer statements to the District Attorney. The County Judge denied the motion to exclude and under the New York rule left to the jury the question of whether the confession was voluntary. See 21 U.Chi.L.Rev. 317 (1954). After deliberating for over 28 hours the jury found Wade, two of the convicts and one Edward Kiernan guilty of first degree murder, but in the case of Wade and Kiernan they recommended mercy and life imprisonment.[2]
 
 
 4
 The Attorney General does not dispute that Wade has exhausted his state remedies as required by 28 U.S.C. 2253. The Appellate Division affirmed Wade's conviction without opinion, People v. Wade, 2 Dept. 1942, 265 App.Div. 867, 38 N.Y.S.2d 369, and the Court of Appeals did likewise, 1943, 291 N.Y. 574, 50 N.E.2d 660, reargument denied 1944, 292 N.Y. 577, 54 N.E.2d 693. It should be noted that at no time has any state court judge set forth the reasons for the unanimous rejection of Wade's claims. The Supreme Court denied certiorari 1943, 320 U.S. 789, 64 S.Ct. 200, 88 L.Ed. 475, rehearing denied 1944, 320 U.S. 815, 64 S.Ct. 426, 88 L.Ed. 492, the petitioner appearing pro se in the Supreme Court. On his appeals Wade argued that his confession was involuntary and this claim was the subject of his first petition to the District Court filed on July 20, 1956.
 
 
 5
 Wade's second petition of February 1957 alleged suppression of evidence by the District Attorney in failing to produce the clothing Wade wore during his detention prior to arraignment and in taking measures to make one of Wade's alibi witnesses unavailable. The suppression of evidence claims were first raised November 1955 by application for coram nobis which was denied by the Westchester County Court on March 17, 1956. The Appellate Division denied leave to appeal in forma pauperis on April 23, 1956, and certiorari was likewise denied 1957, 352 U.S. 974, 77 S.Ct. 372, 1 L.Ed.2d 328. Having done all he could to seek redress in the state courts and in the Supreme Court of the United States, Wade was clearly entitled to a hearing in the federal courts. United States ex rel. Marcial v. Fay, 2 Cir., 1957, 247 F.2d 662, United States ex rel. Smith v. Jackson, 2 Cir., 1956, 234 F.2d 742.
 
 
 6
 After Wade filed his first petition in July 1956, Judge Foley ordered the Attorney General and the District Attorney to show cause. They filed affidavits and the record of the trial, the briefs filed in the Court of Appeals and the petitions for certiorari. On these papers and the oral argument of the Attorney General, Judge, Foley considered the petition. As the questions at issue were the admitted facts before the trial court and the inferences to be drawn therefrom, it was quite proper for Judge Foley to dispense with a hearing and to make his decision on the basis of the record already made. Brown v. Allen, 1953, 344 U.S. 443, 503, 73 S.Ct. 397, 97 L.Ed. 469; United States ex rel. Caminito v. Murphy, 2 Cir., 1955, 222 F.2d 698, certiorari denied 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788. Judge Foley denied the first petition on September 26, 1956, D.C., 144 F.Supp. 458. By consent that appeal was held in abeyance until the state courts had acted on the coram nobis application and until Judge Foley had passed on the questions raised in the second petition of February 1957, which he did on July 17, 1957. In his denial of Wade's petitions Judge Foley appears to have rested heavily on the unanimous state court decisions all of which were without opinion. Nevertheless he granted certificates of probable cause which permitted the prosecution of these appeals.
 
 
 7
 We are mindful that the federal courts should be loath to interfere with the course of criminal justice administered by a state where a serious crime has been committed, here the fatal shooting of a prison guard by three escaping inmates. We are also fully aware of the undesirability of setting aside a seventeen year old jury verdict which, until now, has been unanimously affirmed by the New York appellate courts, both on the original appeal and in subsequent proceedings. Watts v. State of Indiana, 1949, 338 U.S. 49, 50, 69 S.Ct. 1347, 93 L.Ed. 1801.
 
 
 8
 Notwithstanding whatever weight it may be appropriate to assign to such review as the state courts may have made of such a claimed violation of constitutional rights, it is the duty of the federal courts to make their own independent examination of the record to determine whether on the basis of the undisputed facts there is any merit to the claim. If the undisputed facts disclose that a defendant's confession was involuntary, and it appears that without this evidence he would not have been convicted, his conviction and detention have been obtained in violation of the due process of law promised by the Fourteenth Amendment. In such cases the writ of habeas corpus should issue. Leyra v. Denno, 1954, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948; United States ex rel. Caminito v. Murphy, supra. See, also, Stein v. People of State of New York, 1953, 346 U.S. 156, 73 S.Ct. 1077, 97 L.Ed. 1522. Doubtless it was word of the Leyra and Caminito decisions which dealt with facts strikingly similar to those at bar, which stirred the petitioner to knock on the federal court doors fifteen years after his conviction. Of course, such a lapse of time does not bar the petition. In Palmer v. Ashe, 1951, 342 U.S. 134, 72 S.Ct. 191, 96 L.Ed. 154, the Supreme Court ordered a hearing for a habeas corpus petition which attacked a conviction 18 years old. In Caminito, supra, the writ was granted 14 years after the conviction. We have held that a delay of 13 years between conviction and the petition should not prevent the issuance of the writ, Savini v. Jackson, 2 Cir., 1957, 250 F.2d 349.
 
 
 9
 Thus it is our duty to examine the trial record of 2,688 pages in three printed volumes of testimony and exhibits considered by the jury in Westchester County at the trial which lasted from May 26 to June 27, 1941, for such undisputed facts as bear upon the 23 hour period from Wade's arrest at 3 A.M. on April 14, 1941, to his arraignment at 2 A.M. on April 15, and the circumstances surrounding the two question-and-answer statements which were stenographically recorded at the State Police Barracks at Hawthorne commencing at 10:13 P.M. of April 14 and later at 1:03 A.M. of April 15.
 
 
 10
 $4 Wade's claim of coercion was first made when he testified at his trial and is repeated in his petition. In summary his claim is that commencing shortly after he was brought to the Ossining police headquarters he was repeatedly struck and kicked by officers and troopers of the State Police and this treatment continued after his removal to the Barracks. He charges that he was continually knocked down and pulled up by his hair and later by a rope tied around his wrists until he bled profusely, that he was punched in the face and kicked in the groin, that he had no sleep at any time, and had no food until after his second statement when he was given a glass of milk and some water after 22 hours of confinement. As a result of this treatment Wade asserts that he could resist no longer and he finally gave the answers which were suggested to him and that his incriminating answers were not the truth.
 
 
 11
 Just before 3 A.M. in the early morning of April 14, 1941, Wade and Kiernan were arrested by an Ossining police officer, Vincent Kelly, just as they were about to take a taxi at Langton's taxi office on May Street to go to White Plains. Within the half hour preceding, Riordan, McGale and Waters, serving time at Sing Sing Prison, had made a miraculous escape after many months of planning. In the prison hospital McGale and Waters shot and killed a prison guard, John Hartye, just after he had made his 2:30 A.M. report. All three then made their was to the basement, opened numerous doors by means of keys secretly made, and went through a 314 foot long tunnel which carried various pipes to a power house across the New York Central tracks. The tunnel opened 30 feet above the railroad tracks and they slid down a rope and ran along the tracks to the street. There they unexpectedly encountered an Ossining police car and in an exchange of gunfire a policeman was killed[3] and Waters was either killed or took his own life.
 
 
 12
 It was immediately apparent to the police, and it was amply proven at the trial, that the prison break had required not only long and careful planning by the prisoners but outside help to smuggle in the guns and ammunition which the convicts used in their escape. In addition, around 5:30 A.M., three hours after the break, Ossining police found a Plymouth sedan parked under the ramp near the railroad station. In the rear seat were a machine gun and rounds of ammunition. The Plymouth turned out to have been stolen from 39th Street and 7th Avenue in New York City where it had been parked at 7:30 P.M. the evening before. When found it bore the license plates of a Pontiac which had been stolen in New York on February 22.
 
 
 13
 Meanwhile when first questioned after their arrest, wade and Kiernan stated that they had driven up from New York with two girls, that they had had a fight with them when they got to Ossining and that the girls drove away and left them. Wade gave his true name and address and for identification produced a bill of sale for an automobile. Wade consistently denied any knowledge about the jail break until 8 P.M. on April 14, which was 17 hours after his arrest. The statements obtained by the end of 23 hours of confinement and questioning told quite a different story. In brief Wade finally admitted that he had twice trailed the truck which delivered milk inside the prison so that the guns and ammunition could be secreted and so delivered to Waters, that he had stolen the Plymouth, that he knew about the machine gun, and that he and Kiernan had driven up to Ossining with two other friends, Charlie Bergstrom and Robert Brown,[4] Wade driving the Plymouth and the others in an Oldsmobile. When Wade and Kiernan heard the shooting they changed their plan to leave in the Oldsmobile and tried to take a taxi to White Plains.
 
 
 14
 After the gun battle with the Ossining police, Riordan and McGale compelled a shad fisherman at gun point to row them across the Hudson River. They finally surrendered about 8 A.M. to Ossining police and state troopers who surrounded them in the woods. Brought back to the Ossining police headquarters handcuffed together, Riordan and McGale were knocked to the ground by a Sing Sing prison guard and struck by an Ossining policeman. Pictures taken by William Stahl, a Daily Mirror photographer, leave no doubt of the reception which was tendered to Riordan and McGale at the headquarters despite the presence of numerous reporters and photographers.[5] While it is not our province to pass on the credibility of the testimony of state troopers and police that Riordan and McGale were not struck or kicked or mistreated at any time thereafter, and that Wade and Kiernan were not mistreated at any time during the long hours they spent in custody prior to arraignment, we must observe that at the Barracks no non-police or non-prosecution witnesses were present to report what happened.[6]
 
 
 15
 But the undisputed facts and the inadequate explanations made by the state are sufficient to show that by violence and harassment Wade's statements were finally extracted from him against his will because he could resist no longer and he knew there was no other way to bring an end to his ill treatment. The admitted facts and the inadequate explanations from which we conclude that Wade's confessions were involuntary may be summarized as follows:1. Although arrested at 3 A.M. on April 14, Wade was not arraigned until about 2:30 A.M. the following day, more than 23 hours later, after he and Kiernan had finally made their statements. Riordan and McGale, who confessed much earlier, had been arraigned at 7 P.M., 7 1/2 hours before Wade and Kiernan.
 
 
 16
 2. During the 23 hours Wade was not permitted to sleep and he was constantly questioned by numerous state troopers and police.
 
 
 17
 3. During the 23 hours Wade had no food. He had one glass of milk about 7 P.M., 16 hours after his arrest, and a drink of water during his last statement which commenced at 1:03 A.M. He refused an offer of sandwiches and coffee at 1 P.M. and at 7 P.M. according to Sergeant Hamblin.
 
 
 18
 4. According to Sergeant Hamblin who was with Wade at the Barracks, Wade did not agree to make a statement until 8 P.M. which was 17 hours after his arrest. According to Major Moniz, attached to the District Attorney's office, this was after Wade for at least 7 hours had repeatedly denied any complicity to Moniz.
 
 
 19
 5. Although the District Attorney, at least two of his assistants, more than a dozen officers and troopers of the state police and at least four officers and policemen of the Ossining police department were at the Barracks from some time in the morning, Wade's question-and-answer statement was not started until 10:13 P.M., more than 19 hours after his arrest. So far as the record shows, neither the District Attorney nor his assistants were occupied in questioning any of the prisoners during almost 6 hours before 10:13, although the District Attorney stated in his summation and argued to the jury that he was constantly occupied until Wade finished his second statement sometime after 1 A.M. The District Attorney and some of the officers did go to Louis' restaurant for supper but apparently this did not take much over an hour.
 
 
 20
 6. George H. Gordon, Jr., the court reporter who took stenographic notes of the examinations, testified that Wade was reluctant and deliberate in his speech and 'didn't speak clearly at times.' He had to sit next to Wade so that he could hear him better. He said there were times during Wade's examination when he was told not to put down questions and times when there was talk off the record. Wade looked tired and mumbled his words. Gordon could not swear that suggestions had not been made to Wade as to the answers he should give. He testified that after the first statement Wade was taken out and brought back again an hour and a half later to answer further questions starting at 1:03 A.M.
 
 
 21
 7. When Wade was brought back at 1:03 A.M. to answer further questions put by the District Attorney, he made several statements in contradiction of his earlier answers. These contradictions concerned (1) where the machine gun had been kept, and from whom it had been obtained, (2) that Charlie Bergstrom and Robbie Brown had also driven up from New York with Kiernan in an Oldsmobile, (3) that Charlie Bergstrom was with them instead of 'Jimmy Hannon,' (4) that the cars in which the four had ridden up were a Plymouth, which Wade drove, and an Oldsmobile instead of a Ford as Wade first stated. Most important of all, Wade finally admitted at the 1 A.M. questioning that he had twice trailed the milk truck, once with Brown and Bergstrom and once with Kiernan and Brown 'to see where (they) could find a good spot to put the guns underneath.' This admission, wrung from Wade after 22 hours of confinement, was the most vital of all. Without it there was no case of Wade's complicity in the escape as there was no independent evidence whatsoever to support this admission. /7/ Wade had made no mention of trailing the truck in his first statement and in fact there is no record of any question put to him about the milk truck prior to 1:03 A.M. The record contains no explanation of what happened in the hour and a half which Wade spent in the dark room, which the troopers used for photographic work, between his first and second statements; we have nothing to account for this additional damning admission. /8/
 
 
 22
 8. The District Attorney never produced the suit worn by Wade at the time of his arrest although he had promised to do so on May 28, 1941 at the beginning of the trial while the selection of the jury was still under way. Wade's counsel at that time stated that the clothing was bloodstained. Thus the failure to produce permits the inference that the suit would have been damaging to the state's case.
 
 
 23
 9. Dr. Edward J. Davis, an interne at the Grasslands Hospital, examined Wade on April 14 at the County Jail and made a written report which stated that Wade had 'ecchymotic areas' on his body, described as discolorations produced by hemorrhage beneath the skin which could have been caused by blows.
 
 
 24
 10. Four weeks later, on May 13, Dr. Henry T. Kelley, representing the state, examined Wade, together with Dr. Abraham Clahr, who represented Wade.[9] Dr. Kelly found a scar an inch and a quarter long on Wade's left thigh, a scar on his left wrist and a scar on the inner surface of his lower lip. When Wade complained of a penetrating pain in the region of his eighth rib, both doctors confirmed that he had been tested to obviate the possibility of malingering and that it appeared to them that he was not faking about the pain in the rib region. These marks and pains could have been the result of blows inflicted on April 14.
 
 
 25
 11. Upon Wade's arraignment he was asked whether he waived examination or wanted an adjournment. Wade first said he wanted an adjournment, but when the Assistant District Attorney told him to waive examination Wade did so. Neither at this time nor at any time during his 23 hour confinement was Wade advised of his right to counsel.
 
 
 26
 12. Two other defendants, who were also kept at the Barracks, likewise showed signs of rough treatment. Dr. Davis testified that when he examined McGale on April 14 he found an abrasion on the lower part of the left leg, crusted blood on the left nostril and a sore jaw. Kiernan was examined on April 15 in the County Jail hospital by Dr. Davis who testified that he found ecchymotic areas on the left eye and on Kiernan's trunk. These were dark blue discolorations. One area in the pit of the stomach was about the size of a baseball. He also found a long laceration on his left shin.
 
 
 27
 13. No explanation was ever given under oath as to why the prisoners were removed from Ossining to the state police barracks, a twenty minute ride by car, although they had to be brought back to Ossining for arraignment. The District Attorney, who never was sworn as a witness, stated in his summation that this was done on his order. In his opening the District Attorney had asserted that Wade and Kiernan made statements to him freely and voluntarily. In his summation he stated that the prisoners were taken to the barracks 'because the feeling was so high, and we did not want them to stay there.' He also stated 'If I have given myself to be present at a time that a single hand was laid upon any of the four defendants in any way, shape or manner, then my integrity should be impeached by you.' This he followed up later with a statement which is as much unsworn testimony as it is argument:
 
 
 28
 'There was never a hand laid on any of those four men after they left Ossining. Sure we talked to them for 21 1/2 hours you say, without sleep. They were tired and we were tired, and I think the facts show what we did, the amount of work we did there during those hours that we spent there. The only thing they are complaining about is that we got the most incriminating statements probably ever presented to a jury.'
 
 
 29
 When the judge overruled objections to this questionable statement, the District Attorney went further and suggested that the black and blue marks testified to by Dr. Davis had been administered to Wade and Kiernan because they must have had a fight with Brown and Bergstrom. /10/ Although there was no evidence of this whatsoever, the judge also overruled the objections to this while stating that he recalled no such evidence. On this appeal the Attorney General does not advance the District Attorney's explanation for the black and blue marks, but he suggests instead that they probably may have been received at the Ossining police station.[11] Of course this argument is in some measure in support of Wade's allegations although it shifts the onus from the state police to the Ossining police.
 
 
 30
 We have referred to the prosecutor's unsworn remarks and his arguments as they constitute the only attempt to explain the admitted facts of the doctors' testimony and reports. In the face of these facts the strategy of the state was tantamount to an admission that it could not fully and honestly meet the claims that Wade and Kiernan had been beaten before their arraignment. By deliberately making an issue of his own integrity in his summation, by cross-examining Wade so as to imply that Wade and he had a different recollection as to what had happened, by stating as facts matters concerning which he must have had some knowledge although he did not submit himself to be examined as a witness, the District Attorney, in our opinion, underscored the weakness of the state's position.
 
 
 31
 Taking a man to the state police barracks, keeping him incommunicado for 23 hours during which he is permitted no sleep, with no food whatsoever, and only two glasses of liquid after many hours, submitting him to constant questioning despite his denials, is not only degrading and uncivilized but it is obviously coercive. This treatment, without convincing explanation of its reasonableness, is sufficient to indicate that the resulting statement was involuntary and that it was given to put an end to what most of us would consider torture.
 
 
 32
 Such detention of a defendant in the complete and exclusive control of the police without arraignment has been denounced by the Supreme Court because it 'breeds coerced confessions. It is the root of the evil.' Watts v. State of Indiana, supra, 338 U.S. at page 57, 69 S.Ct. at page 1351; 22 Tenn.L.Rev. 1015 (1953). Indeed the New York Criminal Code requires that a defendant be arraigned 'without unnecessary delay.' New York Code of Criminal Procedure, 165. But failure to arraign without unnecessary delay, even though it constitutes a violation of the state code is only one factor to be considered in the determination of whether a confession is involuntary. People v. Snyder, 1947, 297 N.Y. 81, 92, 74 N.E.2d 657; Lisenba v. People of State of California, 1941, 314 U.S. 219, 235, 62 S.Ct. 280, 86 L.Ed. 166; Stroble v. State of California, 1952, 343 U.S. 181, 72 S.Ct. 599, 96 L.Ed. 872.
 
 
 33
 The two reasons suggested by the state for the delay in Wade's arraignment are that it was necessary to protect the defendants because of the state of public feeling; and secondly, that it was necessary to allow for a prompt and thorough investigation. The first reason seems specious in the light of the fact that Riordan and McGale had been arraigned.
 
 
 34
 As to the second reason for delay in arraignment, namely the necessity to conduct a prompt and thorough investigation, all we are deciding here is that the 23 hour delay was far more than was reasonably necessary for such an investigation, especially in view of the fact that the state has made no explanation of how those hours were used to pursue the investigation and why it was necessary to hold Wade for so long.
 
 
 35
 The Attorney General quite correctly urges that some opportunity for interrogation is essential in order to administer criminal justice. Of course law enforcement officers must be permitted some leeway between the time of arrest and arraignment where a serious crime has just been committed and inquiry must be made of all those who are nearby and who may have information. This is necessary delay. In this case the fact that a hot pursuit of Riordan and McGale was then under way would contribute to the necessary delay. In addition the presence of Wade and Kiernan in Ossining at the very time of the prison break would itself prompt questioning by the police. A further factor, if known to the police at the time-- as it well may have been, would have been Wade's record of five arrests even though he had never been convicted. But after Riordan and McGale had been brought back to Ossining and when it shortly became apparent that Wade insisted on his original story and would not voluntarily disclose more, the requirements of the New York Criminal Code came into play and it cannot be said that delay beyond that point was necessary. Of course, when shortly after 5:30 A.M. the Ossining police found the stolen Plymouth underneath the railroad ramp an exploration of that subject by the questioning of Wade and Kiernan was entirely proper, especially as Lieutenant Mead had seen two men at 2:08 A.M. near the place where the Plymouth was later discovered. As stated above, at the trial Lieutenant Mead identified the two men as being Wade and Kiernan. Obviously what is necessary and proper depends upon the circumstances of each case with its special requirements and emergencies. We have held that a period of 9 hours between detention and arraignment was sufficient indication of possible coercion, along with other factors, to require a hearing. United States ex rel. Alvarez v. Murphy, 2 Cir., 1957, 246 F.2d 871.
 
 
 36
 Judge Foley in his opinion denying the first petition surmised that the reason for the delay in arraignment was to facilitate the capture of the other conspirators. 144 F.Supp. 458, at page 461. But Riordan and McGale were captured at 8 A.M. and were back in Ossining shortly afterwards. Riordan made his statement to the District Attorney at 11:22 A.M. and McGale followed at 12:21 P.M. and 3:50 P.M. and their arraignment took place at 7 P.M. Moreover, the abundant manpower available from the District Attorney and members of his staff, the Ossining police department and more than a dozen officers and troopers of the state police made it possible to go forward simultaneously with the questioning of all of the prisoners as well as the pursuit of the investigation generally.
 
 
 37
 Thus it is clear that the time consumed in capturing and questioning Riordan and McGale at most accounts for only a small fraction of the time during which Wade was detained and it is insufficient to support the contention that the 23 hour delay was necessary. State Police Inspector Nugent admitted that part of the reason why Wade was not arraigned with Riordan and McGale was that he had not made a statement by that time.
 
 
 38
 On the most favorable view of the evidence from the standpoint of the state it must still be said that on the admitted facts the circumstantial evidence to support the contention that Wade's statements were involuntary is so strong and the explanation of the state is so weak and inconclusive that we have no choice but to conclude that the statements were involuntary.
 
 
 39
 It was impossible for Wade to call any witnesses other than those who had a strong interest and a fraternal compulsion to deny the allegations or to claim that they did not know what happened. When law enforcement officials create a situation where those in their custody have no means of communicating with the outside world and no way of calling their plight to the attention of any disinterested persons for as long as 23 hours, common sense requires that we conclude that the observance of the constitutional rights of their prisoners was secondary to obtaining incriminating statements from those so isolated. Such methods are inherently coercive. Watts v. State of Indiana, supra, 338 U.S. at page 57, 69 S.Ct. at page 1351; United States ex rel. Caminito v. Murphy, supra, and the cases cited therein.
 
 
 40
 When in addition the ordinary essentials of life are denied to the prisoners by refusal of sleep and food and sufficient drink there can be little doubt that the resulting confession is involuntary. Here the record even goes beyond that. The uncontradicted reports and testimony of three doctors tend to show that Wade bore marks on his body which were consistent with his claim that he was beaten during his 23 hour restraint.
 
 
 41
 Therefore we conclude that this record supports beyond any doubt Wade's claim that his confession was involuntary. The confession should not have been admitted against Wade; its admission in evidence was in violation of due process of law.
 
 
 42
 We must next inquire whether there was enough other evidence, apart from the confession, to support Wade's conviction. The Supreme Court in Stein v. People of State of New York, supra, after holding that the jury could have found the confessions involuntary, in the absence of impeachment by conceded facts, went on to inquire whether there was enough evidence to support a verdict of guilty apart from the confessions. Mr. Justice Jackson pointed out at pages 188 to 194 of 346 U.S., at pages 1094 to 1097 of 73 S.Ct. that there was sufficient evidence to support the convictions of Stein and Cooper apart from the confessions. This other evidence consisted of 'direct testimony of the surviving victim, Waterbury, and the well-corroborated accomplice, Dorfman, as well as incriminating circumstances unexplained.' Thus the affirmance of the convictions in Stein rests on two grounds.
 
 
 43
 In Wade's case not only was the confession involuntary, but an examination of the record shows that without his confession the evidence was wholly insufficient to support his conviction.[12]
 
 
 44
 Here there is no independent evidence of any kind that Wade did anything to further the prison escape and as the indictment related solely to the murder of the prison guard Hartye, committed in the course of the felonious escape, the state's case against Wade could not have survived a motion to dismiss. The only evidence which connects Wade with the activities before the escape is his own coerced admission that he followed the milk truck on two occasions for the purpose of determining how the guns could be secretly attached to the truck in order to take the guns through the prison gates to the convict conspirators. That there is no admissible testimony to support this last minute admission, which was absolutely essential to the prosecution of Wade for felony murder, is striking testimony to the evils which are inherent in all coercive methods.
 
 
 45
 Apart from the confession the other evidence against Wade was: (1) Wade knew Riordan and Waters, and he had known Kiernan for twenty years. Wade admitted this in his testimony at the trial. (2) Wade's presence in Ossining together with Kiernan at the time of the jail break. (3) Lieutenant Mead of the Ossining police, while driving in a police car, saw two men at 2:08 A.M. walk 25 feet near where the stolen Plymouth containing a machine gun and ammunition was later found parked under the railroad ramp. At the trial Mead identified Wade and Kiernan as the two men. (4) Wade's improbable story as to how he drove to Ossining, and why he was without means to return to New York except by taxi.
 
 
 46
 While this evidence adds up to a suspicion that Wade knew more than he admitted and the speculation that he may have been on hand to help the three convicts and Kiernan after the escape had been effected, in our opinion it falls far short of being enough to take the case to the jury on a charge of felony murder by aiding and abetting the escape.
 
 
 47
 It follows that Wade's conviction was in violation of due process as it resulted from the use of an involuntary confession without which he could not have been convicted.
 
 
 48
 We express to Henry C. Roemer, Jr., and Philip C. Potter, Jr., counsel assigned to represent Wade on this appeal and in matters preliminary thereto, our appreciation for their services which have been performed in accordance with the best traditions of the bar.
 
 
 49
 The order of the District Court denying Wade's first petition is reversed with the direction to issue the writ of habeas corpus forthwith. The appeal from the denial of the second petition is dismissed.
 
 
 
 [1]
 Felony murder is a homicide committed by one engaged in a felony. As first degree murder it carries a mandatory death sentence unless life imprisonment is recommended by the jury. New York Penal Law, McKinney's Consol.Laws, c. 40, 1044(2), 1045, 1045-a. Here the jury recommended life imprisonment for Wade. In New York one who aids and abets is a principal in both the felony and the felony murder. People v. Michalow, 1920, 229 N.Y. 325, 128 N.E. 228; New York Penal Law, 2
 
 
 [2]
 The other two defendants, Riordan and McGale were electrocuted after the Court of Appeals had unanimously affirmed their convictions without opinion, People v. Riordan, 1942, 288 N.Y. 544, 42 N.E.2d 12
 
 
 [3]
 The trial judge excluded any evidence concerning or any reference to the fact that the gun battle between the three convicts and the Ossining police resulted in the immediate killing of an Ossining policeman. However, that fact is pertinent on this appeal as it bears upon the attitude of the police and the state troppers
 
 
 [4]
 Bergstrom and Brown were not indicted, and there is no evidence in the record, apart from the confessions, that they had anything to do with the escape or the presence of Wade and Kiernan in Ossining. Wade did testify that he knew charles Burke, also referred to as Bergstrom, and Robert Brown
 
 
 [5]
 The atmosphere at Ossining headquarters was admitted by Arthur W. Mead, Ossining police lieutenant in charge, on cross-examination:
 'Q. And it was perfectly all right with you to have these prisoners beaten and knocked around, wasn't it? A. Perfectly all right for them to be knocked down, yes, sir.
 'q. And beaten? Is that right? It was in accordance with your wishes? A. Not wishes.
 'Q. But you were satisfied? A. Yes, sir.'
 
 
 [6]
 Although photographs were taken at the Barracks, apparently they were for police records and none were produced at trial
 
 
 [7]
 Of course we can give no weight whatever to Kiernan's confession so far as Wade is concerned. Kiernan, in his confession, extracted at 11:13 P.M., stated that Wade had trailed the truck on one occasion. Kiernan did not testify and the trial judge instructed the jury several times that Kiernan's confession was not admissible against Wade. All the defendants had moved for separate trials which motions the trial judge overruled on the basis of the District Attorney's assertion that all four defendants had confessed and that there was independent proof as to the actual participation of each. Stein v. People of State of New York, supra, at pages 194-196 of 346 U.S., at pages 1097-1098 of 73 S.Ct., held that there was no constitutional error in admitting confessions of other defendants under instructions that they were to be considered only against the confessing defendant
 
 
 [8]
 Meanwhile Kiernan had been questioned, and when Wade's name was introduced into the questioning he implicated Wade in trailing the milk truck in his answers although Kiernan never mentioned Wade's name himself in this connection
 
 
 [9]
 The delay in having this further examination of Wade is probably accounted for by the fact that his sister did not see him until three and a half weeks after his arrest. Thereafter counsel was retained for Wade and the examination followed
 
 
 [10]
 Of course this assumed the truth of the confessions in order to argue that they were voluntary because any marks on Wade and Kiernan were administered before they were taken into custody. The state adduced no evidence that Wade and Kiernan had been in a fight, or bore any marks when they were arrested at 3 A.M
 
 
 [11]
 Respondent's Brief, p. 14: 'Wade testified that he was also assaulted in the Ossining police station, which may well account for the few bruises which Dr. Davis said he found on the man'
 
 
 [12]
 The trial judge did not charge the jury that if they found that the confession was involuntary they must acquit. Regarding the testimony other than the confession, he left it to the jury 'to say whether or not the State established these facts to your satisfaction beyond a reasonable doubt, and * * * to say, assuming (they) reject the confessions, whether the State has established the complicity of Wade and Kiernan by evidence aside from the confessions.' Record, pages 2441-2
 The record fails to show what requests were made by Wade's counsel prior to the charge. The judge merely stated that Wade's counsel argued that there was no evidence against Wade except the confession, and that Wade must be acquitted if the confession was rejected.