UNITED STATES of America ex rel.
Samuel Tito WILLIAMS,
Appellant,

v.

Edwin M. FAY, Warden of Greenhaven
Prison, Stormville, New York,
Respondent-Appellee.

No. 397, Docket 27911.

United States Court of Appeals
Second Circuit.

Argued June 18, 1963.

Decided Oct. 4, 1963.

Pasco M. Bowman, II, New York City, for appellant.

William I. Siegel, Asst. Dist. Atty. for Kings County, Brooklyn, N. Y. (Edward S. Silver, Dist. Atty. for Kings County, on the brief), for respondent-appellee.

Before LUMBARD, Chief Judge, SMITH, Circuit Judge, and BRYAN; District Judge.

J. JOSEPH SMITH, Circuit Judge.

Relator was convicted of first degree murder in the County Court of Kings County on January 22, 1948. At his sentencing on March 2, 1948, the trial judge refused to follow the jury's recommendation that relator be sentenced to life imprisonment, and on the basis of certain ex parte information, sentenced him to death by electrocution. On direct appeal to the New York Court of Appeals, relator contended that the confessions he had made that were introduced against him at the trial had been coerced and that the sentencing procedure was unconstitutional. The conviction and sentence were affirmed without opinion, People v. Williams, 298 N.Y. 803, 83 N.E.2d 698 (1949). The amended remittitur acknowledged that the court had upheld the constitutionality of the New York statutes which permitted the imposition of a death sentence based on ex parte information. People v. Williams, 298 N.Y. 863, 84 N.E.2d 446 (1949). Relator appealed to the Supreme Court on this question alone, and his sentence was affirmed. Williams v. New York, 337 U.S. 241, 69 S.Ct. 1079,

93 L.Ed. 1337 (1949). However, on November 16, 1949 his sentence was commuted to life imprisonment by Governor Thomas E. Dewey.

The second round of court proceedings was initiated by a petition for a writ of habeas corpus, filed in the District Court for the Northern District of New York, alleging that the confessions admitted at the trial had been coerced. This petition was denied on the merits. United States ex rel. Williams v. LaVallee, 170 F.Supp. 582 (N.D.N.Y.1959). We affirmed on the ground that relator had not yet exhausted his state remedies as required by 28 U.S.C. § 2254, expressing no opinion on the merits. United States ex rel. Williams v. La Vallee, 276 F.2d 645 (2 Cir., 1960). The Supreme Court dismissed relator's appeal, Williams v. La Vallee, 362 U.S. 637, 80 S.Ct. 1082, 4 L.Ed.2d 1019 (1960), and denied certiorari, 364 U.S. 922, 81 S.Ct. 287, 5 L.Ed.2d 261 (1960). The New York Court of Appeals denied relator's motion for reargument of the original appeal. People v. Williams, 11 N.Y.2d 888, 227 N.Y.S.2d 1025, 181 N.E.2d 854 (1962), cert. denied 370 U.S. 960, 82 S.Ct. 1614, 8 L.Ed.2d 826 (1962). A writ of *coram nobis* was denied by the County Court of Kings County, relator having pursued this remedy at our suggestion on the prior appeal. It is clear that presently existing state remedies are now exhausted; the State makes no argument that they are not. 28 U.S.C. § 2254; Fay v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963). Relator again brought his petition, this time in the District Court for the Southern District of New York, and it was again denied on the merits. United States ex rel. Williams v. Fay, 211 F.Supp. 359 (S.D.N.Y.1962). He takes this appeal from the order denying his petition. We conclude that this denial was error, that the undisputed facts reveal that relator's confessions were the product of coercion as a matter of law, that the introduction of them against him at trial was a violation of his right to a trial conducted in accordance with the standard of due process of law guaranteed by the Fourteenth Amendment, and that we must therefore reverse and direct that the writ be issued.

The crime for which Williams is now in prison is the slaying of a 15-year old girl during the course of a burglary. The intruder beat her over the head with an iron bar, causing unconsciousness from which she never awakened. Her 10-year old brother was a witness to the crime; he was also struck by the burglar and injured. About 5 months later, on September 8, 1947, at 2:30 A.M., relator was arrested by the police. He is a Negro, then 18 years old, with no prior convictions of crime, but with a history of trouble with law enforcement agencies and social maladjustments. Apparently he had had some high school education, but the record does not reveal how much. Relator's physical condition was poor; he had had rheumatic fever which had caused a weakened heart (resulting in his early discharge from the Navy for medical reasons) and swelling in his legs causing difficulty in walking.

After the arrest, the police brought Williams to the station house where, beginning at 3:30 A.M. on September 8th, he was interrogated continually by relays of police. He was not asked about the crime for which he was eventually convicted until about 7:15 P.M. the following evening—indeed the interrogators were forbidden by their superiors to do so—but was questioned about other unsolved local crimes. At 9:15 P.M., after nearly 18 hours of virtually continuous interrogation, Williams confessed orally. The final persuasion was an intimation by the police that they would allow him to see his mother, for whom he had already asked several times, and a chaplain, if he confessed. Williams made a further written confession at about 10:00 P.M. and inculpatory statements at a stenographically-recorded question-and-answer session with an Assistant District Attorney which was not completed until 3:00 A.M.—roughly 24 hours after the interrogation had begun. Newspaper reporters and photographers

were also present at this interview. Here, for the first time, Williams was told in a vague way of his right to remain silent. He was never advised of his right to counsel. Notwithstanding all of these admissions, when finally arraigned the next day, September 9, at about 12:30 P.M., some 34 hours after his arrest, Williams pleaded "Not Guilty."

 At trial, the various confessions and inculpatory statements Williams had made constituted the only evidence against him—and the trial court so charged the jury. The murdered girl's younger brother was called by the prosecution and testified that the killer was a white man with "red skin" but recanted this the next day, after, apparently, he had been spoken to by the District Attorney and some detectives; in any event, the State admitted on defense cross-examination of this witness that it was not relying on his testimony. Williams' defense was a profession of innocence and an attack on the veracity of the confessions. He testified, and not without some corroboration, to brutal torture by the police which had forced him in despair to confess falsely. The record leaves the impression that Williams grossly exaggerated the story of physical abuse. The police denied anything more than the questioning which we have summarized above. We shall make no further mention of this aspect of the case for whether or not disputed questions of fact are closed to our scrutiny on this proceeding, see Townsend v. Sain, 372 U.S. 293, 313, 315, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the undisputed facts show coercion under present standards of due process. The trial judge submitted the issue of the voluntariness of the confession to the jury, in accordance with governing New York law. The guilty verdict was necessarily

a finding that the confessions had not been coerced. However, the question is not closed by the jury verdict, as the District Court apparently believed. The ultimate fact of coercion is one to be independently determined by the court on application for a writ of habeas corpus from the undisputed historical facts if no hearing has been had.[1] Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed. 2d 1265 (1959); Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L.Ed. 948 (1954); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944); United States ex rel. Wade v. Jackson, 256 F.2d 7 (2 Cir.), cert. denied 357 U.S. 908, 78 S.Ct. 1152, 2 L.Ed.2d 1158 (1958). Comparison of the circumstances of relator's detention with the facts of prior decided cases which have found confessions to be coerced makes it plain that under governing law these confessions were not "the voluntary product of a free and unconstrained will," Haynes v. Washington, supra at 514 of 373 U.S., at 1343 of 83 S.Ct., 10 L.Ed.2d 513, and that they were therefore inadmissible against him.

In Turner v. Pennsylvania, 338 U.S. 62, 69 S.Ct. 1352, 93 L.Ed. 1810 (1949), the accused was apparently a mature man, who was arrested and questioned over a period of 5 days, never more than 6 hours on any one day. He confessed after a total of about 23 hours questioning—roughly the same amount as Williams. It would be mere speculation on our part to try to determine whether the impact of questioning is better adapted to wear down the accused's will to resist when it is spread over a period of several days, producing a steady abrasion, or whether a single protracted session with fatigue and despair increasingly allied

---

1. Our consideration is not foreclosed by the statement of the Supreme Court on the prior appeal that "[a]ppellant was found guilty after a fairly conducted trial." Williams v. New York, supra at 252, of 337 U.S., at 1085 of 69 S.Ct., 93 L.Ed. 1337. As we pointed out in our prior opinion, "this does not suffice to demonstrate the

Supreme Court's consideration of the issue now posed in light of the parties' silence on the subject and the jurisdictional fact that the Supreme Court is restricted to that ground which sustains its appeal jurisdiction." United States ex rel. Williams v. La Vallee, supra at 647 of 276 F.2d.

with the inquisitor, will more readily extort a confession. Williams was subject to the latter, Turner to the former, for about the same amount of time. Neither was advised of his right to counsel or his right to remain silent. Moreover, Williams was less able to withstand protracted questioning because of his poor health and comparative youth. Turner's confession was held to have been coerced; Williams presents a situation at least equally compelling.

In Haley v. Ohio, 332 U.S. 596, 68 S.Ct. 302, 92 L.Ed. 224 (1948), a 15-year old boy confessed after 5 hours questioning when confronted with false confessions made by alleged accomplices. He was not advised of his right to counsel and to remain silent until the signing of the confession. Though Williams was three years older, he was interrogated four times longer than Haley, likewise not advised of his rights, and the immediate occasion of his confession was likewise an impermissible inducement. The Supreme Court found that Haley's confession should have been excluded and the conclusion logically extends to Williams as well.

The accused in Spano v. New York, supra, was 25 years old, foreign born but with some high school education. He had surrendered to the police on the advice of an attorney whom he had retained. His lawyer also quite wisely advised him to remain mute when questioned. After only 8 hours of interrogation, marked by appeals to the accused to confess from a childhood friend then on the police force, Spano confessed. He had not been allowed to consult with his attorney, but presumably was aware of his right to one, and specifically had been advised of his right to remain silent, as Williams had not been. He had a history of emotional instability, but Williams was also maladjusted and considerably younger. In finding the confession to have been the product of impermissible coercion, the Supreme Court emphasized the accused's fatigue after 8 hours of interrogation. If such be the case, the 24 hours of continuous interrogation un-der the more adverse circumstances that produced Williams' confessions can be nothing else than coercion as a matter of law.

In Haynes v. Washington, supra, there was no claim of physical abuse, deprivation of food or rest, or uninterrupted long periods of questioning. The accused was a mature individual who had a record of previous contacts with the police. Haynes confessed his crime once to the arresting officers on the way to the police station, again after ½ hour of questioning that evening, and again during 1½ hours of questioning the next morning. The last confession was signed that afternoon, 16 hours after arrest, and admitted in evidence. This confession was held to have been coerced through the combination of a threat of continued detention and the promise that defendant could see his family if he confessed. This pressure falls far short of that to which Williams was subjected for a longer period of time, and with less ability to resist. It would be little short of irrational to contend that Haynes' confession was coerced while Williams' was not.

Finally, turning to decisions of this court, although other cases from the Supreme Court might be noted (see also Culombe v. Connecticut, 367 U.S. 568, 81 S.Ct. 1860, 6 L.Ed.2d 1037 (1961); Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957); Malinski v. New York, 324 U.S. 401, 65 S.Ct. 781, 89 L.Ed. 1029 (1945)), we find further corroboration of our conclusion. In United States ex rel. Caminito v. Murphy, 222 F.2d 698 (2 Cir.) cert. denied 350 U.S. 896, 76 S.Ct. 155, 100 L.Ed. 788 (1955), the accused was an adult with no prior arrests or convictions. He was interrogated for five hours, starting three hours after his arrest, allowed an eight hour rest in an unheated (it was May, however) and sparsely furnished cell, then interrogated another eleven hours until he confessed. Detectives masquerading as witnesses pretended to identify him. We held the confession thus secured from Caminito to be the

product of coercion rather than free will. Adherence to this decision demands the same conclusion for Williams' confessions.

The record of events leading to Williams' confessions yields practically every one of the factors found relevant in the cases cited above in determining whether a confession has been coerced or not. He was subjected to a long and exhausting interrogation by relays of questioners. Perhaps he did not hold out as long as some have, but it was longer than others were able. Compare Ashcraft v. Tennessee, supra (36 hours of interrogation) with Spano v. New York, supra (8 hours of interrogation). Moreover, his weakened physical condition and relative youth must form part of the calculation of what period of questioning would have been permissible. See Haley v. Ohio, supra. Nor was he advised of his right to legal counsel or of his privilege to remain silent, both common factors in many cases. See, e. g., Turner v. Pennsylvania, supra. There was a long delay in arraignment, demonstrating a callous attitude toward the legal rights of the accused on the part of the police. Culombe v. Connecticut, supra. While he was questioned, Williams was held incommunicado despite his efforts to see his mother, the natural person to whom he would turn, and it was the veiled promise that this request would be granted which was the final inducement to confession. See Haynes v. Washington, supra. Finally, when at last brought before a magistrate, he pleaded not guilty, an almost immediate repudiation of the confession which had been wrung from him. See Ashcraft v. Tennessee, supra. A confession obtained by these methods cannot be introduced against an accused consistently with the constitutional guarantee that his life and liberty may not be taken from him without due process of law. Events have made it plain that the innocent as well as the guilty will, on occasion, yield to psychological pressure expertly applied. To protect the innocent the use of products of such pressure must be denied in all cases. While it is the rule stated in the cases, and most recently reiterated in Haynes v. Washington, that the issue of voluntariness is one of ultimate fact, to be determined from the undisputed historical facts, with due weight given to a verdict on the issue by a jury which has observed the witnesses, the cases unmistakably teach that pressures such as those here employed require a ruling of coercion as a matter of law.

We express our appreciation to Pasco M. Bowman II, counsel assigned to represent Williams on this appeal, for services which have been performed in accordance with the best traditions of the bar.

As there was no evidence against Williams at the trial, other than the confessions which we now hold to have been inadmissible, a retrial may be unlikely. If, however, the State should desire one 16 years after the crime, it should be had promptly. We reverse the order appealed from denying the petition for the writ and direct that the writ be issued at once, requiring release of relator unless promptly retried on the indictment.

Order reversed with directions to issue the writ applied for.

LUMBARD, Chief Judge (concurring).

Following the mandate of the Supreme Court expressed in Haynes v. Washington, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed. 2d 513 (1963) and earlier cases discussed in Judge SMITH'S opinion, we are compelled to nullify the administration of criminal justice by the State of New York whereby Samuel Tito Williams was found guilty of murder in the first degree in beating to death a 15-year old girl who discovered him burglarizing the bedroom in which she and her younger brother were sleeping. A reading of the record amply confirms the opinion of Mr. Justice Black, expressed when this case was before the Supreme Court on another question, that: ."The evidence proved a wholly indefensible murder committed by a person engaged in a burglary," 337 U.S. 241 at 243, 69 S.Ct. at 1081, 93 L.Ed.

1337 (1949). It is almost certain that as a result of our action, taken more than 16 years after the murder, Williams will escape justice for the taking of a life; worse still, he may be set free to endanger others.

We prohibit New York from using Williams' confession because it has been established by the Supreme Court that Williams' right to due process at the hands of the state prohibits the use of a confession obtained only after some 18 or 19 hours of detention and continuous questioning by the police. The undisputed circumstances of such detention and questioning are now considered to be so inherently coercive as to support by themselves the claim that Williams' confession was not voluntary. It follows that the state may not use the confession in a criminal proceeding.

Cases such as this raise a very serious question, whether the states are powerless to make the kind of inquiry which will bring to justice those who rob at night and murder their victims leaving no witness who can identify them. As a judge who must pass upon these cases where federal court intervention is sought, I cannot concur without pointing out that the courts have been left to make rules and apply constitutional standards with little, if any, real knowledge or guidance regarding the difficulties which face the police in solving such crimes in our crowded metropolitan centers. Moreover, Congress and the legislatures have failed to make appropriate inquiry and statutory provision to meet the situation.

Statistics issued by highly respected agencies of federal, state and city governments constantly remind us that there has been and continues to be a disturbing increase in crimes of violence, especially in the large cities, and that an increasing percentage of these crimes remains unsolved and unpunished. Is the increase in crime due in part to the fact that an increasingly smaller percentage of serious crimes is being solved? Why is it becoming more and more difficult to protect the public against such crimes of violence? Is it because it has become more difficult in recent years to obtain sufficient evidence of guilt? Have federal court decisions protecting individual constitutional rights made it unduly difficult for law enforcement agencies?

We should not continue to disregard these and similar pertinent problems. No society organized under law would be worthy of the name if it could not afford adequate protection against crimes of violence to its law-abiding citizens. In the long run no community will tolerate a situation where its citizens are fearful of going upon the streets alone at night, where a knock on the door strikes terror in defenseless householders and where a citizen feels that to protect himself and his family he must be prepared to take the law into his own hands. Before any self-respecting community permits such a condition to develop it will re-examine its administration of criminal justice, and even constitutional safeguards as the courts have construed them, lest in the desire to protect individual rights the larger and greater rights of all the people to be secure in their persons and in their homes becomes secondary.

Is it not possible for the states to study and adopt measures which would better protect suspects against coercive and improper police conduct during detention and at the same time give the police adequate time and proper means for investigating serious crimes, particularly murder?

Here a night prowler entered a backyard sometime after 1 A.M. on April 20, 1947, armed himself with an iron bar, forced open a window and entered the Graff apartment on the ground floor of 143 East 96th Street in the Brownsville section of Brooklyn. He was ransacking the bedroom when 15-year old Selma Graff woke up and grappled with him. He took the 2-foot iron bar and beat her into unconsciousness; she died a few hours later. Although Selma's 10-year old brother knew what was happening in the darkened room he could not identify the assailant. The killer fled, leaving behind the iron bar, a flashlight wrapped

in orange paper, and a twig torn from a bush in the yard and used to hold down the window shade.

More than four months after the murder, at 2:30 A.M. on September 8, 1947, a police patrol operating about one-half mile from the Graff neighborhood noticed Williams coming from a back alley off Howard Avenue. The police had earlier been informed that a prowler had been seen in this vicinity. Since there had been many unsolved robberies in these neighborhoods, as is apparent from the record, particularly from cross-examination of Williams at his trial, and since Williams' explanation of his presence on Howard Avenue was apparently unsatisfactory, the police took him into custody and found a pencil flashlight in his possession.[1]

Williams was then taken to the apartment where he was boarding, at 122 Sutter Avenue, where the police apparently found in his room numerous articles which supported their suspicions. Williams had no employment at the time and had not been working for many weeks. The police took him to a nearby station house where he was questioned by patrolmen and by detectives. Apparently numerous people were called to the station house to see whether they could identify Williams or some of the objects found in his room. This procedure took many hours as the persons involved had to be located at home or at their places of work. It was the strategy of the police—quite understandable under the circumstances—first to question Williams about other burglaries before asking him about the entry of the Graff apartment, and it was not until sometime after 7:00 P.M. that any questions about the Selma Graff murder were put to Williams.

The police now have little or no guide either under New York law or federal court decisions from which they can determine with any safety how long they may detain and question a suspect under such circumstances as we find here. That there was good reason to detain and question Williams is abundantly clear. Anyone prowling in a back alley at 2:00 A.M., with a pencil flashlight, some distance from his own home, in a neighborhood where numerous robberies have been reported, ought to be detained and questioned. The process of questioning is futile unless it can be done in some privacy, and where all relevant information is available, so that the suspect may be confronted with minimum delay. Such measures are necessary to

---

1. Williams was specifically questioned about several robberies all of which he denied. Of course the state had to tread very lightly on this subject. For this reason the record is very bare of details regarding the police activities and matters concerning which Williams was questioned in the 16-hour interval between arrest and the time when reference was first made to the entry of the Graff apartment. The district attorney's brief at page 30, spells out what the record strongly hints at:

"Williams was apprehended under suspicion of having committed a number of burglaries. The police were occupied during the daytime hours of September 8th in the investigation of these burglaries. The sole clue which they had concerning his commission of the Graff murder was the orange paper-covered flashlight. It was therefore not only normal, but excellent, police procedure to refrain from questioning him concerning the murder until they had other evidence,—conclusive evidence,—with which to confront him in relation to the major crime. This course of procedure, however, could not be disclosed by the prosecution on the trial."

Of course all the circumstances surrounding the arrest, detention and questioning of Williams, and further investigation and confrontation relevant thereto, might have been very material on the question of the reasonableness of Williams' detention and why he was not sooner arraigned. The district attorney could have asked the district judge to take evidence as to these matters, or the district judge might himself have requested testimony and evidence on this subject. If in the light of our opinions the district attorney feels that evidence may still be adduced as to these matters and that there is a possibility that the result would be different, I, for one, would favor remanding the case for that purpose, meanwhile withholding decision on the writ.

apprehend violators and indeed in order to clear suspects of suspicion.

Law enforcement authorities ought to be empowered to question, to test, to confront and to identify witnesses and suspects for some reasonable period of time. Anything less than such means of inquiry would render the police powerless to protect the public.

Of course one who chooses not to speak may not be compelled to do so. However, the fact is that with but rare exceptions even those with criminal records or associations usually are willing to answer questions put to them by police authorities.[2] Even answers which are false or only partly truthful may be of great value in the process of investigation, just as they are useful in cross-examination upon trial.

There is nothing immoral or unreasonable in expecting that many suspects, when confronted with incriminating evidence, or with someone who identifies them will admit their transgressions. All of the world's great religions teach in one form or another that confession is good for the soul and that by making confession one may be absolved, in part at least.[3] Ever since 42 B.C. it has been a maxim that "Confession of our faults is the next thing to innocency."[4] A duty to confess is ingrained in all of us to some extent, so much so that to many people telling the truth and "coming clean" satisfies a basic spiritual need of one who has transgressed and provides a measure of relief. Nor is it improper or immoral for police officers, under a duty to solve a crime, to urge a suspect to tell what he knows. These considera-

tions give strong support to allowing law enforcement officers to question a suspect and to letting him know the case against him or the matters needing explanation, so that the witness or suspect may explain if he can. They may appeal to such person to assist them in the solution of a crime by telling what he knows even though he may incriminate himself. The Fifth Amendment does not command that no one shall be asked or permitted to answer questions because he might thereby incriminate himself; the Amendment merely prohibits the government from compelling anyone to incriminate himself.

Reasonable means of detention and private interrogation should be permitted where, as here, there is probable cause to believe that the person detained has been engaging in certain specific criminal activity. At the same time perhaps even this much ought not to be permitted unless the suspect be protected from undue pressures and improper treatment. Experience has taught us that all too often we cannot trust law enforcement agencies themselves to be fair judges of what is proper detention and treatment of persons who are completely within their power and without means of summoning aid or even someone to witness their situation. Usually the only witness for the suspect is himself. While there is good reason to believe that objectionable third-degree practices are not as widespread now as they were in 1947 and earlier, it would seem that no detention or questioning beyond a few hours is desirable without the supervision of some independent quasi-judicial authority.[5] Obviously in murder cases and

2. See, for example, United States v. Bufalino, 285 F.2d 408 (2 Cir., 1960), where, of 58 persons who were stopped for questioning about their meeting at Joseph Barbara's estate in Appalachin, New York, in 1957, only one refused to answer any questions at all. Of the 58, about 25 had police records. See also United States v. Vita, 294 F.2d 524 (2 Cir., 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962).

3. Romeo and Juliet, Act II, sc. 3, line 56. See also Psalms 32:5; James 5:16; I John 1:8.

4. Maxims of Publilius Syrus, No. 1060, Bartlett's Familiar Quotations, 13th ed. 1955, page 46b.

5. See New York Code of Criminal Procedure § 165, which requires that the defendant be taken before the magistrate "without unnecessary delay." Only a few

under the circumstances here attendant there would be good reason for a commissioner or magistrate to authorize further detention of a suspect such as Williams, perhaps requiring some careful record of police activity during continued detention and even the presence of some appropriate impartial observer.

Here there is no doubt that Williams' claims of brutality and torture were greatly exaggerated. But at the least it is difficult to believe that the conduct of the police did not place him in very real fear of brutality and ill treatment, sufficient to raise a serious question regarding the voluntariness of his confession. It is far safer for society to resolve the doubt in such cases in favor of the detainee and to bar his confession; without such a rule of law there would be little or no protection against coerced confessions. But this does not mean that our law enforcement agencies must remain powerless to make adequate investigations.

In my opinion there is reason to believe that careful exploration of means to reconcile the requirements of due process and the necessity adequately to investigate and solve an increasing number of crimes of violence would produce methods far more satisfactory than those in present use. Were the state legislatures and the Congress to conduct such inquiries and enact appropriate measures the courts would be under a duty to favor them with a strong presumption of propriety and to abstain from substituting their own untutored ideas and personal views about what is proper and necessary in law enforcement. At least it would seem that methods worked out by the legislative branch of the government would be entitled to a fair trial period.

My concurrence in our action is reluctant for another reason. Whether or not Williams is guilty of the charge of murder, there is surely grave doubt in view of his record and past medical history that he should be at liberty and free possibly to molest and injure others, to rob homes and to assault those who may resist him. I doubt whether New York State now has available means adequately to safeguard the public by detaining persons like Williams until it is reasonably clear that they will not repeat prior infractions. There have been altogether too many instances where unconditional release of a dangerous criminal or a person of criminal tendencies has had disastrous consequences to other innocent law-abiding citizens.

If it is desirable and possible to bring any proceeding to commit Williams [6] — which, of course, must take into account his history during the 16 years since his arrest in September 1947—it may be that the state should be permitted—at least so far as possible federal court intervention is concerned—to use as evidence Williams' confessions which we have barred the state from using in this criminal proceeding. If it can be shown that Williams is a disturbed person whose freedom is fraught with danger to others, his detention in an appropriate institution would not be for the purpose of punishing him for crime. In that case his detention pursuant to state law would be to protect the public and, indeed, to protect Williams himself from the consequences of further criminal acts. While the use of such evidence in a commitment proceeding would be for the determination of the New York courts in the first instance, I know of no specific federal court case holding which would preclude the state from using Williams' confessions to impose restraints on him in state proceedings which do not seek criminal sanctions.

states have statutory provisions which set out more extensive requirements for arrest procedure. See Warner, The Uniform Arrest Act, 28 U.Va.L.Rev. 315 (1942) ; N.H.Laws, 1941, c. 163; R.I. Pub.Laws, 1941, c. 982.

6. See New York Mental Hygiene Law §§ 71 et seq., 87, 121 et seq. It is doubtful whether any law enforcement authorities have the power to institute such proceedings themselves.